# Exhibit A

## 08 C 248

**JUDGE MANNING
MAGISTRATE JUDGE KEYS**

| | |
|---|---|
| 2120 – Served | 2121 – Served |
| 2220 – Not Served | 2221 – Not Served |
| 2320 – Served By Mail | 2321 – Served By Mail |
| 2420 – Served By Publication | 2421 – Served By Publication |
| SUMMONS | ALIAS - SUMMONS        CCG N001-10M-1-07-05 ( |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____LAW_____ DIVISION

(Name all parties)

THREE ZERO THREE CAPITAL PARTNERS, LLC,
on behalf of itself and 303 Energy Trading Alliance,
LLC,

v.

WILLIAM JAMISON, JR., STEPHEN HARPER, JEFFREY ONG
and EVERGREEN ENERGY CAPITAL, LLC,

2007L013635
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

No. _____

## SUMMONS

To each Defendant: PLEASE SEE SERVICE LIST ATTACHED

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room ___801___, Chicago, Illinois 60602

| | | |
|---|---|---|
| ❑ District 2 - Skokie<br>5600 Old Orchard Rd.<br>Skokie, IL 60077 | ❑ District 3 - Rolling Meadows<br>2121 Euclid<br>Rolling Meadows, IL 60008 | ❑ District 4 - Maywood<br>1500 Maybrook Ave.<br>Maywood, IL 60153 |
| ❑ District 5 - Bridgeview<br>10220 S. 76th Ave.<br>Bridgeview, IL 60455 | ❑ District 6 - Markham<br>16501 S. Kedzie Pkwy.<br>Markham, IL 60426 | ❑ Child Support<br>28 North Clark St., Room 200<br>Chicago, Illinois 60602 |

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 31395

Name: SCHWARTZ COOPER CHARTERED

Atty. for: Plaintiff

Address: 180 N. LaSalle Street, Suite 2700

City/State/Zip: Chicago, IL 60601

Telephone: (312) 346-1300

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _____, _____

DEC 06 2007

DOROTHY BROWN
CLERK OF CIRCUIT COURT
_____ Clerk of Court

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

## SERVICE LIST

Stephen Harper
2318 S. Magnolia Court
Spokane, WA  99203


William Jamison, Jr.
6518 S. Highland Park Drive
Spokane, WA  99223


Jeffrey Ong
315 W. Riverside Avenue
Suite 505
Spokane, WA  99201


Evergreen Energy Capital LLC
c/o American Incorporators Ltd.
1220 N. Market Street
Suite 808
Wilmington, DE  19801

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

THREE ZERO THREE CAPITAL )
PARTNERS, LLC, on behalf of itself and )
303 Energy Trading Alliance, LLC, )
)
      Plaintiff, )
)
      v. ) No.
)
WILLIAM JAMISON, JR., STEPHEN HARPER, )
JEFFREY ONG and EVERGREEN ENERGY )
CAPITAL, LLC, )
)
      Defendants. )

2007L013635
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

## VERIFIED COMPLAINT AT LAW

Plaintiff, Three Zero Three Capital Partners, LLC on behalf of itself and 303 Energy Trading Alliance, LLC complains of Defendants William Jamison, Jr., Stephen Harper, Jeffrey Ong, and Evergreen Energy Capital, LLC as follows:

### Count I
### (Breach of Contract v. Jamison, Harper and Ong)

1.    Plaintiff is an Illinois limited liability company with offices in Chicago, Illinois. Plaintiff is the managing member of 303 Energy Trading Alliance, LLC (the "Fund"), an Illinois limited liability company that operates as a private investment fund that specializes in the speculative investment of energy futures, derivatives and related products. The offices of the Fund are located in Chicago, Illinois.

2.    Defendant Evergreen Energy Capital, LLC is a Delaware limited liability company ("Evergreen") located in the State of Washington. Evergreen provided trading advisory services to the Fund during the relevant time period of this Complaint.

453332.2 050598-37338

3.    Defendants William Jamison, Jr. ("Jamison"), Stephen Harper ("Harper") and Jeffrey Ong ("Ong") are individuals who reside in the metropolitan area of Spokane, Washington. They are the principals, owners and traders of Evergreen.

4.    Venue of this case is proper in Cook County, Illinois.  Section 20 of the Trading Advisory Agreement described below provides that, "This Agreement is governed…in accordance with [Illinois law.]  Any dispute relating to…this Agreement shall be litigated exclusively in state or federal courts having their situs within the City of Chicago, Illinois." The financial obligations of Defendants Jamison, Harper and Ong to the Fund which are sought to be enforced hereunder relate to and arise out of their assumption of certain obligations under the Trading Advisory Agreement with respect to the claw-back provision described below.  The Line of Credit Note sought to be enforced in Count III requires enforcement exclusively within courts located in Cook County, Illinois. Defendants performed services for the Fund, which at all times was domiciled and doing business in Cook County, Illinois.

5.    On or around July 1, 2006, Evergreen entered into a Trading Advisory Agreement with Plaintiff, whereby Evergreen agreed to render trading advisory services to the Fund.  A copy of the Trading Advisory Agreement is attached as Exhibit A.

6.    Under the Trading Advisory Agreement, Defendant Evergreen was compensated only if its trading was profitable for the Fund.  Defendant Evergreen was not paid fees.  Instead, it received an "Incentive Allocation."  To this end, Defendant Evergreen established and held a capital account within the Fund (see Exhibit A, section 7), and, in the event Defendant Evergreen's trading for the Fund was profitable during a given period, Plaintiff allocated to Defendant Evergreen's capital account the Incentive Allocation.  (see Exhibit A, section 6).

7.    However, Incentive Allocations were partially provisional.  The Trading Advisory Agreement contained what is commonly referred to in the trading industry as a "claw- back" provision.  A claw-back provision allows a fund to recapture (i.e, take back or "claw back") all or a portion of excess, provisional, incentive allocations and fees. The purpose of a claw-back provision is to ensure that a trading advisor is not unreasonably over-compensated for its services.

8.    Section 6 of <u>Exhibit A</u> contains a claw-back provision which provides that,

> If the aggregate Incentive Allocations paid to the Advisor during the first three quarters of a calendar year exceed the actual Incentive Allocations to which the Advisor is entitled at the year end based on the calendar year's performance of the Fund, the Advisor shall promptly repay such excess to the Fund, not to exceed one-half of the Incentive Allocations already received by the Advisor during the calendar year.

9.    Accordingly, the Fund had claw-back rights which were capped at one-half of Incentive Allocations previously allocated to Defendant Evergreen.

10.    Defendant Evergreen earned its first Incentive Allocation under the Trading Advisory Agreement at the conclusion of the first quarter of 2007; on March 31, 2007, it generated a net trading profit of $1,436,905.44.  Under the compensation term, Evergreen earned an Incentive Allocation of $359,226.36.  Under the claw-back provision, Evergreen would be responsible for paying back up to $179,613.18 should its year-end profits not support such an Incentive Allocation.

11.    Rather than carry an amount of money equal to $179,613.18 in the Evergreen capital account, on or around April 20, 2007, Defendants Jamison, Harper and Ong stated that they wanted to be able to draw down Defendant Evergreen's capital account.  To induce Plaintiff to agree to this, Defendants Jamison, Harper and Ong agreed to individually guaranty the claw-back obligations in section 6 of <u>Exhibit A</u>.  To secure their guaranty, they further agreed to

maintain aggregate individual capital account balances at a level equal to or greater than the amount or the potential claw-back. Defendant Jamison had previously invested in the Fund and a capital account was established for him as of October 1, 2006. As of June 1, 2007, Defendants Harper (along with his wife) and Ong invested in the Fund and individual capital accounts were established for them. Defendants Ong's and Harper's capital accounts increased the Defendants' aggregate capital account balances from $127,619.29 to $192,619.29.

12.     During the second quarter of 2007, Defendant Evergreen lost $1,833,625.43 trading on behalf of the Fund. Under the terms of the Trading Advisory Agreement, Plaintiff reduced Defendant Evergreen's trading capital and put Defendants on notice of their claw back obligation. On or around August 21, 2007, Plaintiff notified Defendants that it wished to terminate the Trading Advisory Agreement due to poor trading performance. Defendant Evergreen concluded winding down trading activities by September 26, 2007. On or around September 28, 2007 Plaintiff notified Defendant of its obligation to repay $179,613.18 of its 2007 Incentive Allocation under the claw back term of the Trading Advisory Agreement.

13.     On or around September 12 and 13, 2007, in knowing breach of their individual promises to maintain the required minimum balances in their aggregate capital accounts, Defendants Jamison, Harper and Ong sought to redeem their capital accounts, without notifying Plaintiff's senior management. As a practice, approximately 90% of requested redemption amounts are released before final monthly accounting is completed. Approximately 90% of Defendants Jamison's, Harper's and Ong's capital account balances were wire transferred to them. A member of Plaintiff's senior management was aware that various redemptions were occurring at that time, but did not realize the redemptions included the Defendants' redemptions.

14.    Plaintiff took back the remaining 10% of Defendants Jamison's, Harper's and Ong's capital account balances and applied the $18,890.10 to the claw-back obligation. Defendants Evergreen, Jamison, Harper and Ong have failed and refused to pay the outstanding portion of the claw-back. Defendants owe the remaining amount of the claw-back, which is $160,723.08 (the total claw-back amount of $179,613.18, minus the amount taken back of $18,890.10)

15.    Pursuant to section 6 of Exhibit A, each and all of Defendants Evergreen, Jamison, Harper and Ong are obligated to pay Plaintiff its reasonable attorneys' fees and court costs in enforcing its rights under the claw-back provision.

WHEREFORE,  Plaintiff Three Zero Three Capital Partners, LLC prays for the entry of a judgment in its favor and against Defendants William Jamison, Jr., Stephen Harper and Jeffrey Ong, jointly and severally, in the amount of $160,723.08 plus Plaintiff's legal fees and costs of collection and such other amounts as the Court deems just and proper.

## Count II
## Unjust Enrichment vs. All Defendants

16.    Plaintiff incorporates by reference paragraphs 1 through 15 of Count I as paragraph 16 of Count II.

17.    Defendants Jamison, Harper, Ong and Evergreen have been unjustly enriched in the aggregate amount of $160,723.08.

WHEREFORE, Plaintiff Three Zero Three Capital Partners, LLC prays for the entry of a judgment in its favor and against Defendants William Jamison, Jr., Stephen Harper, Jeffrey Ong and Evergreen Energy Capital, LLC, jointly and severally, in the amount of $160,723.08 plus costs plus such other amounts as the Court deems just and proper.

**Count III**
**(Enforcement of Line of Credit Note vs. Evergreen)**

18.    Plaintiff incorporates by reference paragraphs 1 through 15 of Count I as paragraph 18 of Count III.

19.    On or about July 27, 2006, Defendant Evergreen executed and delivered to Plaintiff Three Zero Three Capital Partners, LLC (acting on its own behalf, and not on behalf of the Fund) a Line of Credit Note ("Note") in the original principal amount of $100,000. A true and correct copy of the Note is attached as Exhibit B.

20.    The Note provides that the principal amount thereunder is due and payable thirty days after demand.

21.    On or about September 28, 2007, Plaintiff made demand for payment of the Note.

22.    Interest at the rate of ten percent per annum accrues on the principal balance of the Note following thirty days after demand.

23.    Defendant Evergreen has failed to pay the Note.

24.    The principal amount outstanding on the Note is $62,500. Interest commenced accruing on October 26, 2007 at the per annum rate of ten percent.

25.    The Note requires Defendant Evergreen to pay Plaintiff's reasonable attorneys' fees and expenses in enforcing the Note.

WHEREFORE, Plaintiff Three Zero Three Capital Partners, LLC prays for the entry of a judgment in its favor and against Defendant Evergreen Energy Capital, LLC in the amount of $62,500 plus interest at the per diem rate of $17.36 commencing October 26, 2007 and

continuing through the date of judgment, plus Plaintiff's reasonable legal fees and expenses in

enforcing the Note plus such other amounts as the Court deems just and proper.


Dated: _12-6-07_____          **THREE ZERO THREE CAPITAL
                                  PARTNERS, LLC, on behalf of itself and 303
                                  Energy Trading Alliance, LLC**


                                  By:_____
                                      One of its Attorneys


Patrick T. Stanton
Richard T. Reibman
Schwartz Cooper Chartered
180 N. LaSalle Street, Suite 2700
Chicago, IL 60601
Telephone: (312) 346-1300
Attorney No. 31395

## **VERIFICATION**

Under penalties provided by law pursuant to Section 1-109 of the Code of Civil Procedure, Edward Donnellan certifies that he is the an authorized agent of Three Zero Three Capital Partners, LLC, the Plaintiff herein, that he has read the allegations of the foregoing Verified Complaint, that he has personal knowledge thereof and that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters he certifies as aforesaid that he verily believes the same to be true.

EDWARD DONNELLAN

## TRADING ADVISORY AGREEMENT

THIS TRADING ADVISORY AGREEMENT (this "Agreement") is entered into as of July 1, 2006, by and between Evergreen Energy Capital, LLC, a Delaware limited liability company ( the "Advisor"), and Three Zero Three Capital Partners, LLC, an Illinois limited liability company ("303"), which is registered with the Commodity Futures Trading Commission and National Futures Association as a Commodity Pool Operator and Commodity Trading Advisor, and is also the managing member of 303 Energy Trading Alliance, LLC (the "Fund") (collectively with 303, the "Client").

WHEREAS, the Client wishes to invest on its own behalf and on behalf of possible other investors, in the trading of energy futures and futures options, OTC products, and related cash contracts in the manner and on the terms stated below (collectively, "Investment Products");

WHEREAS, the Advisor has experience in operating trading programs and providing trading advisory services with respect to Investment Products; and

WHEREAS, the Advisor has agreed to provide such trading advisory services for the Fund;

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     Appointment of the Advisor.

     (a)     The Client hereby appoints the Advisor, and the Advisor hereby accepts such appointment, as its agent and attorney-in-fact with respect to the management of certain of the Fund's assets (the "Assets"). The Advisor shall have the authority to purchase and sell Investment Products through the use of the Assets at its discretion, provided that the Advisor shall trade the Assets in accordance with the trading program attached hereto as Exhibit A and incorporated herein by reference (the "Trading Program").

     (b)     The Advisor shall perform its obligations hereunder in a manner which, in the reasonable judgment of the Advisor, is designed to achieve the investment objectives of the Fund, and which is consistent with the aforesaid Trading Program.

     (c)     In the event that the Advisor wishes to change its Trading Program or use a trading program or programs other than or in addition to the Trading Program in connection with its trading of the Assets, either in whole or in part, it may do so only after giving the Client advance written notice of its intention to do so and only if the Client has consented thereto in writing.

2.     Maintenance of the Assets. The Assets shall be maintained in one or more accounts (the "FCM Accounts") with futures commission merchants (the "FCMs"),

**EXHIBIT A**

commodity dealers (the "Dealers"), exempt commercial markets (the "ECMs"), or registered broker/dealers (the "Broker/Dealer") which shall be selected by the Client. The Client shall be responsible for the selection and retention of the FCMs, the Dealers, the ECMs and the Broker/Dealer for the payment of any fees, costs or expenses associated with the services to be provided by such entities in connection with the trading activities of the Advisor, and the Advisor shall have no liability to the Client for any loss, damage, cost or expense arising out of or related to the use of any such FCM, Dealer, ECM, Broker/Dealer or bank as a custodian of the Assets, or for the payment of any fees or margin related to such trading or custody arrangements, all of which shall be the responsibility of the Client.

3.    Obligations of the Advisor.  In addition to the foregoing, the Advisor shall have the following obligations with respect to its trading of the Assets:

(a)    Using its best efforts to assure that the Client is able to obtain prompt oral summaries of all transactions effected by the Advisor hereunder at various times during each trading day;

(b)    Assisting the Client, the FCMs, Dealers, ECMs, Broker/Dealers and/or Executing Brokers (as described below) in the reconciliation of any discrepancies between the reports provided to the Client regarding transactions effected by the Advisor hereunder and the reports of such transactions furnished by the FCMs, the Dealers, the ECMs or Broker/Dealers;

(c)    The Client will approve all OTC and listed Executing Brokers selected by the Advisor, and the Advisor shall use its best efforts to assure that all selected brokers provide prompt, accurate and satisfactory execution services. The Client shall be responsible for the payment administration of any fees, costs or trade execution expenses from the FCM, ECM and Broker/Dealer Accounts;

(d)    Providing the Client, upon its request, with any information, documentation or other materials, relevant to the services provided by Advisor to Client, which Client may reasonably request in order to enable the Client to assure that the Advisor is managing the Assets in a professional and reasonable manner;

(e)    Providing the Client, upon reasonable notice and during normal business hours, with access to or copies of any of its books and records upon the Client's reasonable request, subject to Advisor's need to protect any confidential information, in order to enable the Client to assure the Advisor's compliance with the terms of this Agreement, including, but not limited to, its compliance with the Trading Program;

(f)    Notifying the Client immediately about any known matter or thing, whether threatened or pending, and whether potential or actual, which has resulted or which would or could result in any investigation, disciplinary proceeding, indictment, or prosecution of, relating to, or concerning the Advisor or any of its officers, partners, employees or affiliates.  Without limiting the generality of the foregoing, the Advisor shall immediately notify the Client if the Advisor, or any of its officers, partners,



employees or affiliates, is subpoenaed (for documents or oral testimony) in connection with any proceeding; and

(g)    Advisor shall adhere to such leverage and risk parameters as established in the Trading Program. The Advisor shall cooperate with the Client in developing suitable risk management routines and procedures, including the setting of trading limits by the Client with the FCM, ECM and Broker/Dealers.

4.    Other Advisors and/or Other Funds. The Client may allocate Assets to other advisors and/or other funds (the "Other Advisors and/or Other Funds"). Such Other Advisors and/or Other Funds shall enter into a separate trading advisory agreement or subscription agreement with the Client. Advisor and/or its traders shall be permitted to invest up to 20% of the Assets managed by Advisor during the first year of operations and up to 33% in subsequent years. Advisors' capital accounts will reflect only the profits/losses of Advisor's discrete trading performance, as well as deduction(s) for the Client's management fee and incentive allocation where applicable. Notwithstanding the preceding, the Advisor's and its traders' capital accounts shall be exposed to a default by the Fund.

5.    Obligations of the Client.

(a)    The Client shall be responsible for assuring the payment of all margins, premiums, commissions and other amounts due to the FCMs, the Dealers, the ECMs and Broker/Dealers in connection with transactions effected by the Advisor hereunder. The Client shall also authorize and instruct the FCMs, the Dealers the ECMs and Broker/Dealers to furnish the Advisor with copies of any and all statements, confirmations and other documents and materials provided to the Client with respect to trading conducted by the Advisor with such FCMs, Dealers, ECMs and Broker/Dealer hereunder. The Client shall provide accounting assistance to the Advisor; provided, however, that the Client shall not be liable to the Advisor or any of its affiliates for any losses sustained by the Advisor or any of its affiliates in connection with such accounting assistance. The Client hereby reserves the right to negotiate with the Advisor a reasonable monthly fee for its accounting assistance.

(b)    The Client shall place under the management of the Advisor a minimum of $5 million in Assets and up to $10 million in Assets within three (3) months of the commencement of Advisor's trading the Assets, provided Advisor has operated within the Trading Program referenced in Sections 1(a) and 3(g).

6.    Compensation - Incentive Allocation. As compensation for the services to be provided hereunder, the Client shall pay the Advisor an Incentive Allocation equal to 25% of the Fund's New Net Profits on all assets of the Fund under management by the Advisor (as such terms are defined in the Third Amended and Restated Limited Liability Company Operating Agreement of the Fund (the "Operating Agreement")). The Client shall pay Advisor an additional Bonus Allocation of 5% on all profits beyond a 20% net return to the Fund. The Incentive Allocations will be paid out on a quarterly basis with payment made no more than thirty (30) days after the end of each calendar quarter. If the aggregate Incentive Allocations paid to the Advisor during the first three quarters of a



calendar year exceed the actual Incentive Allocations to which the Advisor is entitled at the year end based on the calendar year's performance of the Fund, the Advisor shall promptly repay such excess to the Fund (not to exceed one-half of the Incentive Allocations already received by the Advisor during the calendar year). Notwithstanding any other provision of this Agreement, the Advisor hereby agrees that it shall reimburse the Client for all of the costs and expenses, including reasonable attorneys' fees and court costs, incurred by the Client in connection with any action brought to enforce the Advisor's obligation to repay any portion of the Incentive Allocation to the Fund.

7.    Capital Account.  In order to implement the provisions of Section 6, the Client shall establish a separate capital account on the Fund's books and records for the benefit of the Advisor.  The capital account shall be calculated in accordance with the provisions of Section 6.  The Advisor may make withdrawals from its capital account at any time upon reasonable notice to the Client.  The Client shall have authority to deduct specifically agreed upon expenses from the Advisors capital account

8.    Representations and Warranties of the Advisor.  The Advisor hereby represents and warrants to the Client that:

(a)    The Advisor is a limited liability corporation duly organized and validly existing in the State of Delaware and is qualified to do business and is in good standing in each other jurisdiction in which the nature or conduct of its business requires such qualification and in which the failure to so qualify would materially adversely affect its ability to conduct its business activities.

(b)    The Advisor has full discretionary power and authority to perform its obligations under this Agreement.

(c)    This Agreement has been duly and validly authorized, executed and delivered on behalf of the Advisor and is a valid and binding agreement of the Advisor enforceable in accordance with its terms.

(d)    There is not pending or, to the best of the Advisor's knowledge threatened, any action, suit or proceeding before or by any court or other governmental or self-regulatory authority to which the Advisor, or any of its officers, partners, employees or affiliates, is a party which might reasonably be expected to result in any material adverse change in the financial condition of the Advisor or the Advisor's ability or qualification to trade for the Client.

(e)    The Advisor is and will remain in compliance, in every material respect, with any and all applicable laws and regulations, including applicable provisions of the Commodity Exchange Act, regulations of the CFTC promulgated there under and the rules of any self-regulatory organization with jurisdiction over the Advisor.

(f)    The Advisor has no arrangements or relationships, nor will the Advisor establish or maintain any such arrangements or relationships, with any FCM, Dealer ECM or Broker/Dealer pursuant to which the Advisor or any of its affiliates is or



may become entitled to receive any portion of the commissions or fees paid to such entities by the Client.

(g)    The Advisor will exercise good faith and due care and will under no circumstances deliberately use any procedures in discharging its obligations hereunder that it knows or has reason to believe is, in view of the constraints imposed on the Advisor by the Client, inferior to the procedures employed for any other account for which the Advisor discharges obligations (either alone or in conjunction with others) similar to those undertaken by the Advisor hereunder.

(h)    The Advisor will promptly notify the Client of any material changes in any of the foregoing representations and warranties or of any material changes in the trading approaches or strategies to be utilized in connection with its management of the Assets.

(i)    The Advisor, pursuant to Section 4(m)(1) of the Commodity Exchange Act and CFTC Regulations 4.14(a)(10) and 4.14(a)(10)(B)(1) promulgated there under, is not required to be registered under the Commodity Exchange Act because it advises 15 or fewer persons within a 12 month period and does not hold itself out generally to the public as a commodity trading advisor.

9.    Representations and Warranties of the Client.    The Client hereby represents and warrants to the Advisor that:

(a)    The Client is a limited liability company duly organized and validly existing in the State of Illinois and is qualified to do business and is in good standing in each other jurisdiction in which the nature or conduct of its business requires such qualification and in which the failure to so qualify would materially adversely affect its ability to conduct its business activities.

(b)    The Client has full discretionary power and authority to perform its obligations under this Agreement.

(c)    This Agreement has been duly and validly authorized, executed and delivered on behalf of the Client and is a valid and binding agreement of the Client enforceable in accordance with its terms.

(d)    There is not pending or, to the best of the Client's knowledge threatened, any action, suit or proceeding before or by any court or other governmental or self-regulatory authority to which the Client is a party which might reasonably be expected to result in any material adverse change in the financial condition or regulatory qualifications of the Client.

(e)    The Client understands and acknowledges that (i) trading Investment Products is speculative and involves a high degree of risk, including the risk of loss in excess of the amount initially invested, and that the trading strategies utilized by the Advisor will be speculative, (ii) there can be no assurance that profits will be realized, or losses avoided or limited, as a result of the trading activities conducted by the



Advisor hereunder, and (iii) no "safe" trading system has ever been devised and that the Advisor cannot guarantee profits or freedom from losses in connection with the trading of Commodities.

(f)    The Client will not engage in actions that are disloyal, dishonest or insubordinate, or which constitute negligence, fraud or unprofessional conduct, or actions which adversely affect the business or reputation of the Advisor.

(g)    The Client will promptly notify the Advisor of any material changes in any of the foregoing representations and warranties.

10.    Liability of the Advisor. All transactions in Investment Products entered into hereunder shall be for the account and risk of the Client. The Advisor, including its employees and principals, shall not be liable to the Client for any losses sustained in connection with such transactions including the liquidation of Fund assets pursuant to Section 12(e), or for any errors, acts or omissions committed by the FCMs, the Dealers, the ECMs, the Broker/Dealers or other third parties, unless caused by the gross negligence or willful misconduct of the Advisor, its officers, partners, employees, affiliates or agents.

11.    Indemnification.

(a)    The Advisor will indemnify the Client, as well as its members, managers, employees, shareholders, officers, affiliates and agents, and each person, if any, who, directly or indirectly, controls, is controlled by, or under common control with the Client, and hold such persons harmless from and against (x) any and all claims, demands, proceedings, suits and actions against such persons and (y) any and all losses, liabilities, damages, expenses and costs (including, but not limited to, reasonable attorneys' fees and costs of investigation or preparation of defense) suffered by any such person, which, in the case of (x) or (y) above, result from or relate to (i) any material breach by the Advisor of its duties or obligations under this Agreement, (ii) any material inaccuracy or misrepresentation in, or breach of, any of the warranties, representations, covenants or agreements made by the Advisor herein, or (iii) any act or omission of the Advisor or its agents constituting gross negligence or willful misconduct.

(b)    The Client will indemnify the Advisor, as well as its employees, agents, successors and administrators, and each person, if any, who, directly or indirectly, controls, is controlled by, or under common control with the Advisor, and hold such persons harmless from and against (x) any and all claims, demands, proceedings, suits and actions against such persons and (y) any and all losses, liabilities, damages, expenses and costs (including, but not limited to, reasonable attorneys' fees and costs of investigation or preparation of defense) suffered by any such person, which, in the case of (x) or (y) above, result from or relate to the services which Advisor shall perform under this Agreement with the exception of any matter caused by the gross negligence or willful misconduct of the Advisor.

(c)    Promptly upon receipt of written notice of any claim or demand, or the commencement of any suit, action or proceeding in respect of which indemnity may



be sought under this Section 12, the party seeking indemnification (the "Indemnitee") shall promptly inform the party from which indemnification is sought (the "Indemnitor") in writing thereof. Except to the extent that the Indemnitor is not prejudiced thereby, the failure to so inform the Indemnitor shall relieve such Indemnitor from any liability which it may have to such Indemnitee in connection therewith. The Indemnitor will be entitled to participate in that suit, action or proceeding and shall, at the request of the Indemnitee, assume at its own expense the defense thereof with the assistance of counsel reasonably satisfactory to the Indemnitee. In any such action or proceeding, the Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the Indemnitee's own expense unless (i) otherwise agreed by the Indemnitor and Indemnitee or (ii) the named parties to any such suit, action or proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee, and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Indemnitee will cooperate with the Indemnitor in connection with any such action or proceeding and shall make personnel, books and records relevant to the claim available to the Indemnitor, and grant such representatives and counsel of the Indemnitor as such Indemnitor may reasonably consider desirable in connection with the defense of any such claim.

(d)     An Indemnitor shall not be liable under this Section 12 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder.

12.     Term and Termination.

(a)     Initial and Renewal Terms. This Agreement shall commence on the date hereof and shall continue for an initial period of three (3) years, subject to earlier termination as herein provided. This Agreement shall automatically renew for successive one (1) year periods after the initial term unless either party gives at least forty-five (45) days' prior written notice to the other party of its intention to terminate this Agreement at the end of the then current term. Termination of this Agreement shall discharge only those obligations that have not accrued as of the effective date of termination. Any right or duty of the Client or Advisor based on either the performance or breach of this Agreement prior to the effective date of termination shall survive the termination of this Agreement. The provisions of this Section 12 and Section 13 shall survive any termination of this Agreement.

(b)     Termination. The Client may terminate this Agreement at any time (i) upon five (5) days' prior written notice for any reason or no reason at all, and (ii) immediately for Cause (as hereinafter defined). This Agreement may only be terminated by the Advisor upon the occurrence of a material breach by the Client of any of its obligations, representations or warranties hereunder.

(c)     Definition of Cause. For purposes of this Agreement, any of the following acts or omissions shall give rise to a termination for "Cause" and shall subject the Advisor to the liquidated damages clause set forth in Section 12(d) below:



(i)    The Advisor's intentional misconduct, gross negligence or intentional breach of this Agreement or failure to use its best efforts to maximize trading results;

(ii)    The Advisor's engaging in actions that are disloyal, dishonest or insubordinate, or which constitute gross negligence, fraud or unprofessional conduct, or actions which adversely affect the business or reputation of the Client, or if the Advisor assumes risk greater than those parameters expressly provided by the Client in the Trading Program, all in the Client's sole discretion;

(iii)    The Advisor's failure to maintain any applicable registration requirements of any regulatory body that may have jurisdiction with respect to the Advisor's trading activities; or

(iv)    The Advisor's breach of any material provision Section 8 of this Agreement.

(d)    Liquidated Damages. The Advisor acknowledges that in the event of the Advisor's termination for Cause pursuant to Section 12(b), the Client will suffer substantial damages which may be difficult to determine. Accordingly, the Advisor agrees that in the event this Agreement is terminated by the Client for Cause, the Advisor shall promptly pay to the Client as liquidated damages, and not as a penalty, an amount equal to the Advisor's allocable share of the Fund's New Net Profits for the highest one (1) quarter out of the last three (3) consecutive quarters immediately preceding the date of such termination. The aforesaid liquidated damages shall be in addition to any other amounts for which the Advisor may be liable to the Client hereunder and any other rights or remedies available to the Client at law or in equity.

(e)    Liquidation of Fund Assets. Upon termination of this Agreement, Advisor, Bill Jamison, Stephen Harper and Jeffrey Ong (collectively "Principals"), jointly and severally, hereby unconditionally agree to assist the Client in taking such action with the Fund's funds and trading positions as the Client shall instruct. Without limiting the scope of the Advisor's and Principals' obligation in the preceding sentence to assist the Client after termination of this Agreement, each and all of them, if so requested by the Client, shall assist the Client in the orderly liquidation of any trading positions, transitioning or transferring open positions to a new trading advisor and otherwise using its best efforts to cooperate with the Client post-termination.

(f)    Non-Solicitation of Employees. Upon termination of this Agreement and for a period of two years thereafter, the Advisor agrees that it shall not, directly or indirectly, solicit or induce any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately prior to such solicitation or inducement) of any other Trading Advisor of the Fund to leave the employ of such Trading Advisor, or hire or attempt to hire any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately



prior to such hiring or attempt to hire) of such Trading Advisor. Upon termination of this Agreement and for a period of two years thereafter, the Client agrees that it shall not, directly or indirectly, solicit or induce any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately prior to such solicitation or inducement) of the Advisor to leave the employ of the Advisor, or hire or attempt to hire any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately prior to such hiring or attempt to hire) of the Advisor

      (g)   Grant of Assets Under Management: Capacity. For a period of five years after termination of this Agreement for any reason, if the Advisor and/or Principals shall trade or manage the assets of any other person or entity in a controlling fashion, the Client shall be granted a minimum of 25% of such Advisor's and/or Principals' assets under management capacity for a period of five years. "Controlling" when used with respect to this provision, means the management authority to elect or refuse to advise certain investment accounts.

     13.   Confidentiality. Each of the parties to this Agreement agrees to maintain in strict confidence the terms of this Agreement and any and all information, materials or other documents regarding the other which it obtains pursuant to or in connection with this Agreement, and agrees that it shall not disclose any such documents, material or other information unless required to do so by law, regulation, the request of any regulatory or self-regulatory authority or valid legal process.

     14.   Status of the Advisor. It is understood and agreed that the Advisor shall be deemed to be an independent contractor of the Client and that the Advisor shall not have authority to act for or represent the Client in any way other than hereunder, and shall not otherwise be deemed to be an agent of the Client. The Client shall not control the weekly schedule, working hours, work location or activities of the Advisor (except as to the limited matters set forth in this Agreement). The Advisor shall be solely responsible for payment of any and all taxes of any kind in connection with or relating to its compensation hereunder. Nothing contained herein shall create or constitute the Advisor and the Client as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, nor shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of any other such entity.

     15.   Exclusive Engagement: Management of Other Accounts. During the Term of this Agreement, the Advisor shall provide trading advisory services exclusively for the Fund; provided, however, that if the Advisor obtains the Client's prior written consent, the Advisor may render trading advisory services to, and manage the accounts of, other clients, subject to compliance with the terms of this Agreement, and may utilize the same or different systems, strategies, policies and guidelines in connection therewith, provided that the rendering of such advisory or management services does not materially adversely affect the ability of the Advisor to fulfill its obligations hereunder. Notwithstanding the foregoing, the Client acknowledges that the Advisor's management

of other accounts could have an adverse effect on its management of the Assets under certain circumstances.

16.   Expenses.   The Client shall assume responsibility to pay agreed upon reasonable and necessary business expenses incurred by the Advisor in connection with its duties and obligations under this Agreement provided, however, such expenses must be approved in writing in advance by the Client. Without limitation of the foregoing, the Client may require that the Advisor submit an itemized account of all expenditures and such proof as may be reasonably necessary to establish to the satisfaction of the Client that such expenditures were reasonable and necessary business expenses. The expenses referred to in this section shall not include any transaction related cost or expense of trading the Assets, which shall at all times be the responsibility of the Client and shall not require Client's prior agreement or approval.

17.   Performance Track Record.   Rates of returns generated by the Advisor hereunder are the mutual property of the Advisor and Client, and may be used by either party for marketing purposes subject to the performance reporting requirements of CFTC regulations and all other applicable law and regulation.

18.   Notices. All notices required to be delivered under this Agreement shall be in writing, shall be effective upon receipt and shall by delivered personally or sent by telecopy, telex or registered or certified mail, postage prepaid and return receipt requested, as follows:

If to the Client to:

| | |
|---|---|
| Name: | Three Zero Three Capital Partners, LLC |
| Address: | 303 W. Madison, Suite 400, |
| | Chicago, Illinois 60606 |
| Attention: | Edward Donnellan |
| Phone Number: | (312) 432-5109 |
| Fax Number: | (312) 432-4499 |

If to the Advisor, to:

| | |
|---|---|
| Name: | Evergreen Energy Capital, L.L.C. |
| Address: | 159 South Lincoln Street, Suite L25 |
| | Spokane, WA 99201 |
| Attention: | Stephen Harper |
| Phone Number: | |

19.   No Assignment.   No party hereto may assign any of its rights hereunder without the prior written consent of the other party. This Agreement shall not be construed to confer any benefit on any person other than the parties hereto and their respective successors and permitted assigns.

20. <u>Governing Law; Dispute Resolution</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Any dispute relating to or arising out of this Agreement shall be litigated exclusively in state or federal courts having their situs within the City of Chicago, Illinois.

21. <u>Amendments</u>. This Agreement may not be amended or modified except by written instrument duly executed by each of the parties hereto.

22. <u>Entire Agreement; Counterparts</u>. This Agreement sets forth the entire agreement of the parties relating to the subject matter hereof except as otherwise set forth herein. This Agreement may be executed in one or more counterparts each of which shall, however, together constitute one and the some document. This Agreement may be executed by facsimile transmission.

23. <u>Severability; Waiver</u>. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver granted hereunder must be in writing and shall be valid only in the specific instance in which given.

*[The remainder of this page has been intentionally left blank.]*



IN WITNESS WHEREOF, this Agreement has been executed for and on behalf of the undersigned as of the day and year first above written.

**CLIENT:**

**THREE ZERO THREE CAPITAL PARTNERS, LLC ON BEHALF OF ITSELF AND THREE ZERO THREE ENERGY TRADING ALLIANCE, LLC**

By: _____

Name: Edward Donnellan
Title: Principal

**ADVISOR:**

**EVERGREEN            ENERGY CAPITAL, LLC**

By: _____

Name: Stephen Harper
Title: Principle

Accepted and agreed as to the provisions set forth in Section 12 (e)

_William H Jamison, Jr._
~~Bill Jamison,~~ individually
William H Jamison, Jr.

_Jeffrey Ong,_ individually

Stephen Harper, individually

# EVERGREEN ENERGY CAPITAL, LLC

## RISK MANAGEMENT PARAMETERS, LOSS TRIGGERS AND ACTIONS/PROCEDURES

The purpose of the risk parameters and loss triggers set forth below are to monitor trading risks and contain losses to pre-specified tolerances. These parameters and triggers are supplemented with continuous risk analyses and daily dialogue with the Trading Advisor on market and portfolio conditions. Should 303 Capital Partners, LLC determine losses and/or position size to be unacceptable, it would direct reduction and/or elimination through discussion with the Trading Advisor, as would action in extraordinary market conditions.

### TRADING STRATEGIES
TRADING ADVISOR: Evergreen Energy Capital, LP

Intercontinental Exchange and New York Mercantile Exchange ("NYMEX") listed and OTC natural gas, power and crude futures, futures options and forwards are traded applying various relative value strategies: basis spreads, directional basis and basis arbitrage, as well as limited short term outright positions in NYMEX natural gas, power and crude futures and options.

### APPROVED EXCHANGES
TRADING ADVISOR: Evergreen Energy Capital, LP

The NYMEX, Inter Continental, and NGX are the three approved power, crude and gas exchanges.

| RISK PARAMETERS | Immediate Action for Violation |
|---|---|
| Margin-to-Equity Limit<br>100% of allocated assets | - Notify M. Rane and two other 303 Principals<br>- Discuss cause and record resolution in Evergreen Energy Risk Log |
| VAR Limits<br>One standard deviation move<br>$\leq 4\%$ of AUM | - Same as above |
| Two standard deviation move<br>$\leq 12.5\%$ of AUM | - Same as above |

| LOSS TRIGGERS | Immediate Action |
|---|---|
| $\geq 2.5\%$ of AUM | - Notify M. Rane and two other 303 Principals<br>- Discuss cause and record resolution in Evergreen Energy Risk Log |
| $\geq 5\%$ of AUM | Same as above |



| | |
|---|---|
| ≥ 7.5% of AUM | - Notify M. Rane and two other 303<br>- Commence 25-50% position reduction, or<br>  exceptional alternative; record resolution<br>  in Evergreen Energy Risk Log. |
| ≥ 10% of AUM | - Notify M. Rane and two other 303 Principals<br>- Commence reduction of open positions<br>  by 50%, or exceptional alternative; and<br>  record resolution in Evergreen Energy<br>  Risk Log. |
| Net Asset Value ≤ 75% of AUM | - Notify M. Rane and two other 303<br>  Principals<br>- Commence Liquidation<br>- Record activity in Evergreen Energy Risk |

**ALLOCATIONS AND BENCHMARKS**

- 303 will allocate up to $10,000,000 USD over the first three months of trading. 303 will continue to review Advisor's performance and add capital as needed provided Advisor operates within the Trading Program.

**Approved and Accepted by:**

(  **Michael Rane**
303 Capital Partners , LLC

**Bill Jamison**   William H Jamison, Jr
EVERGREEN ENERGY CAPITAL

### LINE OF CREDIT NOTE

$100,000                                                                July 27, 2006

FOR VALUE RECEIVED, the undersigned, EVERGREEN ENERGY CAPITAL, LLC ("Borrower"), HEREBY UNCONDITIONALLY PROMISES TO PAY to the order of THREE ZERO THREE CAPITAL PARTNERS, LLC, an Illinois limited liability company ("Lender"), at 303 West Madison Street, Suite 400, Chicago, Illinois 60606, or at such other place as the holder of this Note may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the principal sum of ONE HUNDRED THOUSAND and 00/100 DOLLARS ($100,000), or the amount outstanding as endorsed on the grid attached to this Note (or recorded in Lender's books and records, if Lender is the holder hereof). Endorsement or recording by Lender of the principal balance outstanding hereunder shall be rebuttably presumptive evidence of the principal balance due on this Note. The unpaid principal balance outstanding hereunder shall bear interest at the rate provided below from the date such principal is advanced until payment in full thereof.

The principal indebtedness evidenced hereby but unpaid thereon shall be payable within thirty (30) days of demand for payment by Lender.

Interest shall not accrue on the principal balance remaining unpaid under this Note during each calendar month (whether full or partial) from and after the date set forth above until maturity. The interest shall thereafter be at the "Default Rate," which shall mean ten percent (10%), until the principal balance hereof is paid in full. This interest shall be computed on the basis of a year consisting of 360 days and twelve (12) thirty (30) day months.

If payment hereunder becomes due and payable on a Saturday, Sunday, or a legal holiday under the laws of the State of Illinois, the due date thereof shall be extended to the next succeeding business day. Checks, drafts or similar items of payment received by Lender shall not constitute payment to Lender unless and until such item of payment has actually been collected by Lender and credited to Lender's account, but credit therefor, shall, solely for the purpose of determining the occurrence of an Event of Default (as hereafter defined), be given on the date the same is actually received by Lender.

Whenever in this Note there is reference made to Lender or Borrower, such reference shall be deemed to include as applicable, a reference to the respective successors and assigns of said party. The provisions of this Note shall be binding upon and shall inure to the benefit of said successors and assigns. Borrower's successors and assigns shall include, without limitation, Borrower as debtor in possession or a receiver or trustee of or for Borrower.

In no contingency or event whatsoever shall the Default Rate charged hereunder exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Lender has received interest hereunder in excess of the highest rate applicable hereto, Lender shall promptly refund such excess interest to Borrower.

**EXHIBIT B**

For purposes of this Note, an "**Event of Default**" shall occur upon the occurrence of any of the following: (i) the failure of the Borrower to pay any amount due and payable hereunder when due; or (ii) the failure of Borrower to perform, keep or observe any term, provision, condition or covenant contained in this Note or any other agreement entered into between Borrower and Lender.

Upon the occurrence of an Event of Default, at Lender's option, and without notice from Lender to Borrower except as otherwise expressly required herein; (A) Lender may declare the entire unpaid principal balance on this Note immediately due and payable; (B) Lender may exercise any one or more of the rights and remedies accruing to a secured party under the Uniform Commercial Code of the relevant jurisdiction and any right or remedy available at law or in equity; and (C) Lender may exercise any one or more of its rights and remedies under this Note.

The Lender's remedies under this Note are cumulative and concurrent and may be pursued singly, successively, or together against the Borrower, and the Lender may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in the Lender's sole discretion. Failure of Lender, for a period of time or on more than one occasion, to exercise any right or remedy shall not constitute a waiver of such right or remedy at any time during the continued existence of any Event of Default or in the event of any subsequent Event of Default. Lender shall not by any other omission or act be deemed to waive any of its rights or remedies hereunder unless such waiver be in writing and signed by Lender, and then only to the extent specifically set forth therein. A waiver in connection with one event shall not be construed as continuing or as a bar to or waiver of any right or remedy in connection with a subsequent event.

If any attorney is engaged by Lender, including, and without limitation (a) to collect the indebtedness evidenced hereby, whether or not legal proceedings are thereafter instituted by the Lender; (b) to represent the Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Note; (c) to represent the Lender in any other proceedings whatsoever in connection with this Note; or (d) to advise the Lender with regard to its rights under this Note; then in each such case the Borrower shall pay to the Lender all reasonable attorneys' fees and expenses incurred by the Lender in connection therewith, in addition to all other amounts due hereunder.

Lender shall not, by any act of omission or commission, be deemed to waive any of its rights or remedies hereunder unless such waiver be in writing and signed by an authorized officer of Lender and then only to the extent specifically set forth therein. A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion. All remedies conferred upon Lender shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at Lender's option.

To the extent permitted by law, every person at any time liable for the payment of the debt evidenced hereby waives presentment for payment, demand, notice of nonpayment of this Note, protest and notice of protest, trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security therefor, and all exemptions and homestead laws and all rights thereunder, and consents that Lender may extend the time of payment of any part or

the whole of the debt, or grant any other modifications or indulgence pertaining to payment of this Note at any time, at the request of any other person liable for said debt.

This Note has been executed, delivered and accepted at Chicago, Illinois, and shall be interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the laws of the State of Illinois.

THE LENDER AND BORROWER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY, THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH THE LENDER AND BORROWER ARE ADVERSE PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

TO INDUCE THE LENDER TO MAKE THE LOAN, THE BORROWER IRREVOCABLY AGREES THAT ALL ACTIONS ARISING, DIRECTLY OR INDIRECTLY, AS A RESULT OR CONSEQUENCE OF THIS NOTE OR ANY OTHER AGREEMENT WITH THE LENDER, SHALL BE INSTITUTED AND LITIGATED ONLY IN COURTS HAVING SITUS IN COOK COUNTY, ILLINOIS. THE BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING ITS SITUS IN SAID COUNTY, AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS. THE BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE BORROWER IN THE MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.

THE BORROWER WAIVES EVERY PRESENT DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE BORROWER MAY NOW HAVE TO ANY ACTION BY THE LENDER IN ENFORCING THIS NOTE.

Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

BORROWER:

EVERGREEN ENERGY CAPITAL, LLC

Signature: _____
Print Name: STEPHEN A. HARPER
Title: Principle

## SCHEDULE OF
## LOAN ADVANCES AND PAYMENTS

| Date and Loan No. | Amount of Loan | Amount of Payment and Loan No. to Which Applied | Balance Remaining Unpaid | Notation Made By |
|---|---|---|---|---|
| 7-27-06 | $100,000 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |