# EXHIBIT A

LEXSEE 2006 U.S. DIST. LEXIS 68692

**Moore's Maint. & Installation, Inc. v. Hub Group Distrib. Servs.**

**No. 04 C 4891**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 68692*

**September 6, 2006, Decided
September 6, 2006, Filed**

**PRIOR HISTORY:** *Moore's Maint. v. Hub Group Distrib. Servs., 2005 U.S. Dist. LEXIS 25074 (N.D. Ill., Oct. 25, 2005)*

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Moore's Maintenance & Installation, Inc., Plaintiff: David C Hurst, Bruggeman, Hurst & Associates, Ltd., New Lenox, IL; Timothy M Kolman, Timothy M. Kolman & Associates, Langhorne, PA.

For Hub Group Distribution Services, Hub Group, Inc., Defendants: Damon E. Dunn, Neil M Rosenbaum, Funkhouser Vegosen Liebman & Dunn, Ltd., Chicago, IL; David W Marston, Jr, Morgan, Lewis & Bockius, Philadelphia, PA.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

**JUDGE DAVID H. COAR**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Moore's Maintenance & Installation, Inc. ("Moore" or "Plaintiff") is suing Hub Group Distribution Services, LLC and Hub Group, Inc. (collectively, "Hub" or "Defendants") for breach of contract, unjust enrichment, breach of the duty of good faith, and fraud in the inducement. Before this court is Defendants' motion to dismiss the Amended Complaint on the following grounds: (1) Moore's breach of contract claim is precluded by the Service Agreement, (2) Moore's unjust enrichment claim cannot coexist with its express contract, (3) Moore's breach of duty of good faith claims are

foreclosed by the Service Agreement, (4) Moore's fraudulent [*2] inducement claim fails to state a claim, and (5) Hub Group, Inc. does not qualify as a defendant, and should be dismissed. For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**I. FACTUAL BACKGROUND** [1]

1    For the purposes of this motion, the following facts alleged in Plaintiffs' Amended Complaint are taken as true.

Plaintiff Moore's is a Pennsylvania corporation that, among other things, installs display racks, signage, and other fixtures and materials at retail, wholesale and other locations. [2] Defendant Hub Group, Inc. is an affiliate of Defendant Hub Group Distribution Services, LLC, an Illinois corporation with a place of business in Pennsylvania. The corporation offers logistics, distribution, transportation, warehousing, inventory management, and installation services to manufacturers, distributors, and other firms. Hub provides these services with the assistance of subcontractors like Plaintiff.

2    This paragraph includes facts stated in the Service Agreement between Plaintiff and Defendants, attached to Defendants' Motion to Dismiss as Exhibit A.

[*3] In July of 1999, Plaintiff began working with Defendants through a third corporation. In October of 1999, Plaintiff began working directly with Defendants as a vendor. Between July and October 1999, "a problem arose regarding the storage of freight" Defendants inadvertently sent to Plaintiff. (Am. Compl. P 16.) Plaintiff stored the freight in a facility that Defendants instructed Plaintiff to rent. Plaintiff incurred significant costs in renting the facility and then forwarding the freight to other vendors. Invoices reflecting these costs were sent

to different agents of Defendants but were never paid. Defendants later approached Barbara Moore ("Moore"), vice president and secretary of Moore's, with a proposed settlement for a reduced amount. Plaintiff rejected the settlement, but continued to do work for Defendants during this time.

Defendants then requested Plaintiff to provide services for test stores. When Defendants informed Plaintiff what Plaintiff would be paid for servicing the stores, Moore verbally informed Defendants' agents that Plaintiff would not be able to accept the pricing and that Plaintiff would lose money on the project. After disputing the pricing, Plaintiff [*4] continued to do work for Defendants, completing work on eleven stores.

Moore later met with John Shipley ("Shipley"), a Hub executive. Moore informed Shipley that Plaintiff would not be able to continue work if Defendants did not supply the appropriate pricing. Shipley then asked what it would take for Plaintiff to continue work; Moore responded, "3,500." Shipley then stated that Plaintiff would receive $ 3,500 for each store.

The next day, Shipley called Plaintiff to renegotiate the additional $ 3,500 pricing. Plaintiff declined to renegotiate. About one week later, Plaintiff received a termination letter from Defendants. Defendants have not paid any money to Plaintiff for the finished jobs.

Count I of Plaintiff's Amended Complaint alleges breach of contract for Defendants' failure to pay, as agreed, for labor and expertise supplied by Plaintiff. Count II alleges breach of contract for the oral agreement entered into between Shipley and Moore in April 2002. Count III alleges unjust enrichment because Defendants have received good and services for which they failed to pay. Count IV alleges that Defendants breached the duty of good faith under *13 Pa.C.S.A. § 1203* [*5] . Count V alleges that Defendants breached the duty of good faith under common law Finally, Count VI alleges fraud in the inducement: Defendants made a knowingly false, fraudulent, and unsupported representation that they would provide Plaintiff with "significant work, on a national basis" in exchange for Plaintiff's paying for the storage of Defendants' freight. (Am. Compl. P 52). Plaintiff alleges Defendant made this representation "solely to enable Defendant to obtain storage services and other service for labor" without intending to pay those for services. (Am. Compl. P 55). Plaintiff alleges damages in excess of $ 2,000,000.

## II. STANDARD OF REVIEW

The purpose of a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)* is to test the sufficiency of the complaint, not to decide the merits of the case. *Gibson v. City of Chicago,*

*910 F.2d 1510, 1520 (7th Cir. 1990)* (citation omitted). On a *12(b)(6)* motion, the Court accepts all well-pleaded allegations in the plaintiff's complaint as true, *Fed R. Civ. P. 12(b)(6)*, and views the allegations in the light most favorable [*6] to the plaintiff. *Bontkowski v. First Nat'l Bank, 998 F.2d 458, 461 (7th Cir. 1993).*

*Federal Rule of Civil Procedure 9(b)* requires a plaintiff to state with particularity any circumstances constituting fraud. Thus, while a plaintiff may plead states of mind generally, he or she must plead the circumstances--the "who, what, when, where, how"--of the alleged fraud in detail. *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).*

## III. ANALYSIS

### A. Counts I & II

Defendants have moved for dismissal of Counts I (breach of written contract for services rendered) and II (breach of contract on oral agreement) on the ground that breach of contract claims are precluded by the Service Agreement. At issue is whether the oral communication between Moore and Shipley in April 2002 is barred by the Service Agreement.

Generally, oral modifications of a written contract are enforceable, even when the contract prohibits oral modifications. *Tadros v. Kuzmak, 277 Ill. App. 3d 301, 312, 660 N.E. 2d 162, 213 Ill. Dec. 905* (see also, *Bell & Howell Financial Services Company v. St. Louis Pre-Sort, Inc., 1999 U.S. Dist. LEXIS 512).* [*7] This includes subsequent modifications to compensation. However, "where the writing contains an express provision that it constitute[s] the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence." *Nicolella v. Palmer, 432 Pa. 502, 509, 248 A.2d 20. 432 Pa. 502, 248 A.2d 20, 23 (Pa. 1968).* Oral modifications to the Service Agreement are, thus, permissible. If the Service Agreement is read to preclude modifications except in writing, then the *Nicolella* standard should be applied.

Provision 11(a) of the Service Agreement is a merger clause, providing that the four corners of the Service Agreement supercede all "*prior* discussions, understandings, representations and agreements, whether oral or in writing, by or between the parties" (emphasis added). Defendants claim that the integration clause bars claims predicated on prior or subsequent oral agreements, citing *Air Safety, Inc. V. Teachers Realty Corp., 185 Ill. 2d 457, 465, 706 N.E. 2d 882, 886, 236 Ill. Dec. 8 (1999)* and *Bethlehem Steel Corp. V. Tishman-Adams, Inc., 45 Ill. App. 3d 1003, 1009, 360 N.E. 2d 475, 479-*

*80, 4 Ill. Dec. 539 (1st Dist. 1977).* **[\*8]** However, the cited cases are inapposite. These cases concern oral communications *prior* and *concurrent* to contract negotiation and formation. They do not support the contention that *subsequent* oral modifications are barred by the merger clause as stated.

Defendants cite *International Mktg., Ltd. v. Archer-Daniels-Midland Co.*, barring subsequent oral agreements when the contract specifies that its terms "cannot be altered or amended except by agreement in writing signed by the duly authorized representatives of the parties hereto." *International Mktg., Ltd. v. Archer-Daniels-Midland Co., 192 F.3d 724, 730 (7th Cir. 1999).* No language to this effect is found in the Service Agreement. Provision 11(d) permits written modifications without consideration; it does not expressly bar all subsequent oral modifications. Because the contract does not bar subsequent oral modifications, the *Nicolella* standard is not directly applicable. Further, *International Mtg.* applies to sale of goods, relying on UCC Article 2 to preclude modifications to integrated contracts. The present case concerns a service contract, not sale of goods of contract, such that Article **[\*9]** 2 is not accurately applied.

Defendants analogize the unpublished opinion of *Bells Fuels, Inc.* to the present case. In *Bells Fuels, Inc.*, the plaintiff, a "nonexclusive distributor" of lubricants, distributed Chevron products pursuant to a written "Jobber Agreement", specifically allowing for quantities of lubricants to be sold in excess of the maximum quantity specified in the agreement. *Bell Fuels, Inc. v. Chevron U.S.A. Inc., No. 99 C 2586, 2000 U.S. Dist. LEXIS 22341 (N.D. Ill. March 21, 2000).* Further, a provision in the Jobber Agreement states that "no modification of this agreement...shall be binding on [Chevron] unless it is in writing and signed by [Chevron]." *Bells Fuels, Inc. v. Chevron U.S.A. Inc., No. 99 C 2586, 2000 U.S. Dist. LEXIS 22341 (N.D. Ill. March 21, 2000).* These oral modifications to the excess lubricants were found to be barred by the Jobber Agreement. Defendants argue that, similarly, the Service Agreement bars the plaintiff from oral modifications for the additional 55 installation jobs. This analogy is problematic for several reasons. First, the Jobber Agreement governs a sale of goods contract, whereas the **[\*10]** Service Agreement is a service agreement. Second, the Jobber agreement expressly states that Chevron may elect to sell quantities "in excess of the maximum quantities specified." The excess amount is specifically covered in the contract. The Service Agreement does not contain an express provision for additional installations. Oral modifications to increase quantity of installments are not limited by the contract language in the Service Agreement. Third, the Jobber Agreement specifically prohibits binding modifi-

cations ("no modification of this agreement, and no waiver of any provision hereof shall be binding...unless in writing"), whereas the Service Agreement does not prohibit modifications, but expressly permits modifications without consideration, if in writing ("Any and all ...modifications...shall be binding upon the parties hereto despite the lack of legal consideration so long as the same shall be in writing").

Even if it was unclear whether subsequent oral modifications are precluded in the Service Agreement, the controlling law allows oral modifications to a written contract even when the contract prohibits such modifications. *Tadros v. Kuzmak, 277 Ill. App. 3d 301, 312, 660 N.E. 2d 162, 213 Ill. Dec. 905.* **[\*11]** Thus, oral modifications to the Service Agreement are permissible.

Further, the Defendants claim that there is no independent consideration to support an oral modification. When the allegations are viewed in the light most favorable to the plaintiff, the negotiated compensation of $ 3,500 applies to both the eleven jobs already completed and the fifty-five *future* jobs. A promise to pay in exchange for future service is sufficient consideration for a contract. Here the contract can be read to be a promise by the Plaintiff to complete the remaining jobs for an additional $ 3,500 per job.

Finally, the Defendant claims that the alleged oral agreement is unenforceable because it violates the Illinois Statute of Frauds. Under Illinois law, a service contract is barred by the Statue of frauds only "if it is impossible to perform the contract within one year. If, however, it appears from a reasonable interpretation of the terms of the agreement that it is capable of performance within one year, the Statute of Frauds is inapplicable." *Hartbarger v. SCA Services, Inc., 200 Ill. App. 3d 1000, 1016, 558 N.E.2d 596, 606, 146 Ill. Dec. 633 (1990)* (internal citations omitted). The amount of resources **[\*12]** and actual schedule determined is not relevant. The question is whether a reasonable interpretation of the agreement renders the plaintiff capable of performing the 55 installation jobs within one year. Plaintiff alleges that it has historically completed installation jobs within one or two days. It is certainly reasonable that the plaintiff would be able to complete 55 installation jobs within one year at this rate. Therefore, there is not violation of Illinois Statute of Frauds.

For the foregoing reasons, Defendant's motion to dismiss Counts I and II of the Plaintiff's Amended Complaint for failure to state a claim is DENIED.

**B. Count III**

Defendants have moved for dismissal on the ground that Plaintiff's unjust enrichment claim cannot coexist with its breach of contract claims, and should be dis-

missed. The court agrees. When a subject matter is covered by a contract, the two parties governed by the contract may not bring a claim of unjust enrichment on that subject matter. *Util. Audit, Inc. V. Horace Mann Serv. Corp., 383 F.3d 683, 688-89 (7th Cir. 2004).* This issue is clearly decided:

> The theory of unjust enrichment is based on a contract implied in [*13] law. To recover under this theory, the plaintiff must show that the defendant voluntarily accepted a benefit that would be inequitable for him to retain without payment. Because unjust enrichment is based on an implied contract, "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." *People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill. 2d 473, 496-97, 607 N.E.2d 165, 177, 180 Ill. Dec. 271 (1992)*

Because the plaintiff's unjust enrichment claim for the 11 completed installations is a subject matter covered by the Service Agreement, a separate unjust enrichment claim is not permissible. The Plaintiff misconstrues *Aprile Seafreight S.P.A. v. Global Freight, Inc., 2005 U.S. Dist. LEXIS 32797 (D. Ill. 2005).* "To plead the alternative claims of breach of contract and unjust enrichment [*Federal Rules of Civil Procedure 8(e)(2)*]...Plaintiff's unjust enrichment claim must not include allegations of a specific contract governing the parties relationship." *Aprile Seafreight S.P.A.*, Id. The Court in fact rejected the unjust enrichment claim in *Aprile Seafreight S.P.* [*14] *A.* because it was on the same subject matter as the breach of contract claim.

For the foregoing reasons, Defendant's motion to dismiss Count III of the Plaintiff's Amended Complaint is GRANTED.

## C. Counts IV & V

Defendants have moved for dismissal of Counts IV and V on ground that Plaintiff's Breach of Duty of Good Faith claims are foreclosed by the Service Agreement. Federal courts that exercise diversity jurisdiction apply the forum state's conflicts law. *Klaxon v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); D'Acquisto v. Washington, 640 F. Supp. 594, 619 (N.D. Ill. 1986).* Illinois courts recognize the choice of law agreement between parties, and will only engage in traditional conflict-of-laws analysis when parties fail to stipulate choice-of-law between themselves. *Hofeld v. Nationwide Life Ins. Co., 59*

*Ill. 2d 522, 529, 322 N.E.2d 454, 458 (Ill. 1975); H.B. Fuller Co. v. Kinetic Systems, Inc., 932 F.2d 681, 685 (7th Cir. 1991); Newman-Green, Inc. v. Alfonzo-Larrain R., 605 F. Supp. 793, 796 (N.D. Ill. 1985).*

The Service Agreement [*15] contains a choice-of-law provision under Section 11(b), stipulating the use of Illinois law for disputes arising out of or related to the Service Agreement. Because the choice-of-law provision controls, Illinois law governs this breach of contract action arising out of the Service Agreement.

Count IV of Plaintiff's Amended Complaint seeks relief for violation of Pennsylvania law. Pennsylvania law is an improper choice of law, given the choice-of-law provision in the Service Agreement, invalidating Count IV.

Count V of Plaintiff's Amended Complaint seeks relief for breach of duty of good faith at common law. Under Illinois law, independent claims of breaches of implied duties of good faith are not recognized, separate from a breach of contract claim. *Echo, Inc. v. Whitson Co., 121 F.3d 1099 (7th Cir. 1997); Industrial Specialty Chems. v. Cummins Engine Co., 902 F. Supp. 805 (D. Ill. 1995).* In the instant case, the breach of duty of good faith claim is brought in conjunction with a breach of contract claim, and is recognized under Illinois law.

Therefore, Defendant's motion to dismiss Count IV is GRANTED, and motion to dismiss Count V is DENIED.

## [*16] D. Count VI

Defendants have moved for dismissal on the grounds that the Plaintiff failed to state a claim for fraud in the inducement. *Federal Rules of Civil Procedure 9(b)* requires a plaintiff to state with particularity any circumstances constituting fraud, including the "who, what, when, where, how" of the alleged fraud in detail. *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).*

The Plaintiff's Amended Complaint states the who, what, where, when, how of the alleged fraudulent statement. The statement was made by Shipley to Moore (who), regarding the pricing and quantity of installations in an attempt to resolve a dispute about money owed to Plaintiff by Defendant HGDS (what), taking place in Bensalem Pennsylvania (where), in April 2002 (when), via an in-person meeting (how). Paragraph 31-32, 52-53 of Amended Complaint. These facts stated by the Plaintiff satisfies the particularity of facts requirement of *Rule 9(b).*

Defendants further claim that Plaintiff's specific statements or misrepresentations of alleged fraud are not identified. In particular, Plaintiff's allegations of fraud are based on Defendant's [*17] promise of future action

(payment), where failure to perform is a breach of promise rather than fraud. *Zankle v. Queen Anne Landscaping, 311 Ill. App. 3d 308, 724 N.E.2d 988, 244 Ill. Dec. 100 (Ill. App. Ct. 2000)*. Generally, "a promise of future conduct cannot constitute a material misrepresentation in support of an allegation of fraud." *First Nat'l Bank v. St. Charles Nat'l Bank, 152 Ill. App. 3d 923, 934, 504 N.E.2d 1257, 105 Ill. Dec. 739 (Ill. App. Ct. 1987)*. However, if "the promise is made with no intention of performing the acts and is part of a preexisting fraudulent scheme," then it is sufficient for a complaint allegation. *First Nat'l Bank v. St. Charles Nat'l Bank, 152 Ill. App. 3d 923, 934, 504 N.E.2d 1257, 105 Ill. Dec. 739 (Ill. App. Ct. 1987)*. The Plaintiff alleges that Defendant had knowledge that the pricing representations were false, and made the represenations "without any intention to pay for such services." (Am. Compl. P 55-55). Further, Plaintiff alleges that there have been past non-payment by Defendant for storage services, suggesting a "preexisting fraudulent scheme." This satisfies the pleading requirements under *Rule 9(b)*.

For the above reasons, Defendant's motion to dismiss Count VI for Fraud in the Inducement [*18] is DENIED

### E. Motion to Dismiss Hub Group, Inc. As Defendant

Defendants have moved for dismissal of Hub Group, Inc. as a defendant on grounds that Plaintiff failed to allege operative facts against the specific defendant. Generally, corporations are "separate and distinct entities" from "other corporations with which it may be affiliated." *Main Bank of Chicago v. Baker, 86 Ill. 2d 188, 204, 427 N.E.2d 94, 56 Ill. Dec. 14 (Ill. 1981)*. Further, "before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circum-

stances, sanction a fraud or promote injustice." *Main Bank of Chicago v. Baker, 86 Ill. 2d 188, 204, 427 N.E.2d 94, 56 Ill. Dec. 14 (Ill. 1981)*.

The Plaintiff has not provided sufficient facts to show that Hub Group, Inc. controlled its affiliate Hub Group Distribution Services (HGDS) in relation to this case. There are no facts indicating that HGDS was treated as an alter ego of Hub Group, Inc., or that separating the two corporate [*19] identities would sanction fraud or injustice. HGDS is simply stated as an affiliate of Hubs Group, Inc., and based solely on this affiliation, Plaintiffs charge Hub Group, Inc. as a defendant as well. Merely using "Defendants" in the plural form is not a sufficient basis for charging Hub Group, Inc. as a defendant. Further, interactions and communications between the Plaintiff and Defendant in the Complaint are solely with HGDS, not Hub Group, Inc. The mere fact that HGDS is an affiliate of Hub Group, Inc. is not sufficient to hold Hub Group, Inc. liable for the actions of HGDS. *Main Bank of Chicago v. Baker, 86 Ill. 2d 188, 204, 427 N.E.2d 94, 56 Ill. Dec. 14 (Ill. 1981)*.

Therefore, there is insufficient operative facts against Hub Group, Inc., and Defendant's motion to dismiss the defendant Hub Group, Inc. Is GRANTED.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED in part. Dismissal as to Counts I, II, V and VI of the Plaintiff's Amended Complaint are DENIED; dismissal as to Counts III, and IV are GRANTED; and dismissal of Hub Group, Inc. as a party defendant is GRANTED

/s/ David H. Coar

United States District Judge

Dated: **September 6, 2006 [*20]**

LEXSEE 1998 US DIST LEXIS 2491

**Johnson Prods. Co. v. Guardsmark, Inc.**

**No. 97 C 6406**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 2491*

**February 26, 1998, Decided
February 27, 1998, Docketed**

**DISPOSITION:** [*1] Guardsmark's motion to dismiss Counts III through XI of complaint granted in its entirety. Those counts dismissed with prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JOHNSON PRODUCTS CO., INC, plaintiff: Sidney N. Herman, Jason Lloyd Peltz, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL.

For GUARDSMARK, INC., defendant: William G. Schopf, Jr., Arthur J. Howe, Schopf & Weiss, Chicago, IL.

For GUARDSMARK, INC., counter-claimant: William G. Schopf, Jr., Arthur J. Howe, Schopf & Weiss, Chicago, IL.

For JOHNSON PRODUCTS CO., INC, counter-defendant: Sidney N. Herman, Jason Lloyd Peltz, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL.

**JUDGES:** Paul E. Plunkett, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Paul E. Plunkett

**OPINION**

***MEMORANDUM OPINION AND ORDER***

Johnson Products Co., Inc. ("Johnson"), hired Guardsmark, Inc. ("Guardsmark"), to provide security services. More than $ 500,000 worth of Johnson's product was stolen during Guardsmark's two-year tenure, and Johnson alleges that it was taken by Johnson employees and others with Guardsmark's knowledge. Johnson sued Guardsmark under a variety of contract and tort theories

to recover its loss. Guardsmark has moved to dismiss eight counts of the [*2] eleven-count complaint. For the reasons set forth in this memorandum opinion and order, the motion to dismiss is granted.

*Facts*

1 The facts set forth herein are taken from Johnson's complaint unless noted otherwise.

Johnson is a Florida corporation whose principal place of business is in Chicago. It manufactures and sells hair care products. Guardsmark is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is in the business providing security services.

In March 1994 Johnson and Guardsmark entered into a written contract for Guardsmark to provide security services at two Johnson facilities, one of which was located at 1140 E. 103rd Street in Chicago (the "103rd Street Facility"). While Guardsmark provided the original contract, Johnson made changes to it, executed it and returned it to Guardsmark. There is no allegation that Guardsmark rejected the changes. For the 103rd Street Facility alone, Guardsmark was paid approximately $ 275.00 per week.

In November 1995 [*3] Johnson informed Guardsmark that product was being stolen from the 103rd Street Facility and that some of it was being sold illegally at a beeper store on 85th Street in Chicago. Guardsmark allegedly has a history of involvement in thefts at locations it has been hired to secure in the Chicago area. Johnson alleges on information and belief that Guardsmark's employees either participate or acquiesce in the thefts. As a result, Guardsmark allegedly should have been sensitive to Johnson's report of thefts at the 103rd Street Facility.

However, Johnson alleges on information and belief that Guardsmark did nothing in response to the thefts.

Frustrated by Guardsmark's lack of response, on February 22, 1996 Johnson placed an undercover "agent" at the 103rd Street Facility posing as a Johnson employee. Ronald Hill ("Hill"), a Guardsmark security guard, told the agent that he could steal product and nobody would bother him. The following day the agent asked Hill if he wanted money to permit the agent to steal product, which the agent was planning to do. Hill declined payment but told the agent not to worry about being caught. Three days later the agent observed a box of Johnson's product [*4] being stolen via a carting bin that went to the garbage. On February 28, 1996, the agent told Hill that he had been unable to make any money on the product he had stolen the previous week, and Hill suggested that he steal perfume. On March 5, 1996, the agent again informed Hill that he wanted to steal a pallet of product. Hill told the agent the best time to undertake the theft and how much money he could expect to get for the stolen product.

On March 7, 1996, Johnson's private investigator tape-recorded an interview with Jose Guerra ("Guerra"), Guardsmark's supervisor at the 103rd Street Facility. Guerra admitted that he knew that people had been stealing from the 103rd Street Facility by shipping merchandise to themselves through delivery services. That same day, the investigator also tape-recorded an interview with Hill, who admitted that he knew that women stole merchandise, including lipstick. Hill also admitted that he had permitted Johnson's undercover agent to steal merchandise and that he had told the agent when to do so and the value of the merchandise.

Later that day, after learning of the tape-recorded interviews, Johnson's president, Michael Pietrangelo ("Pietrangelo"), [*5] and its investigator contacted Richard Winkelman ("Winkelman") and Drew Christian ("Christian") at Guardsmark to tell them what the investigator had learned. Winkelman admitted that Guardsmark knew that product was being stolen from the 103rd Street Facility. Both Winkelman and Christian conceded that Guerra had acted incompetently. Guardsmark promised to replace the two security guards at the 103rd Street Facility and to begin monitoring it twenty-four hours a day. [2]

[2]  Johnson does not identify who at Guardsmark made these promises. (Compl., P 15.)

On March 8, Pietrangelo sent Winkelman a confirming letter as to the previous day's conversation. In the letter Pietrangelo also informed Winkelman that Guardsmark had failed to replace the two guards at the 103rd Street Facility, which Pietrangelo had learned by

visiting there and finding only Guerra on duty. Pietrangelo asked for an explanation and a confirmation that Guardsmark was able to provide security. Later that day, Guardsmark informed Johnson that Guerra [*6] had been replaced by Bob Tataren ("Tataren"), a supervisor with Guardsmark for six years.

A few days later Johnson learned that Guardsmark had not informed Tataren about the problems at the 103rd Street Facility. Tataren told Richard Kennedy ("Kennedy") of Johnson that he had been told only that he should have two guards on duty during working hours and one guard on duty for nights and weekends, and that he should check all doors. Three days later Kennedy returned to the 103rd Street Facility to meet with Tataren again. This time Tataren informed Kennedy that he had been told only that product had been stolen, but not the means of doing so. Tataren did not know about use of the garbage door, the delivery services, or that Johnson employees removed product on their person. That day, Pietrangelo wrote a letter to Ira Lipman ("Lipman") of Guardsmark, explaining that Johnson had suffered significant losses at the 103rd Street Facility as a result of Guardsmark's failure to perform its duties and expressing the hope that Guardsmark would compensate Johnson without a lawsuit. Four days later, Pietrangelo sent Winkelman a letter informing him that Guardsmark had failed to post two guards [*7] at the 103rd Street Facility during working hours.

On March 26, 1996, Mark Green ("Green"), Guardsmark's vice president and risk manager, wrote to Pietrangelo asking for evidence of thefts at the 103rd Street Facility and of Guardsmark's failure to provide security services. Without responding to Green's letter, Johnson alleges that it worked to document the amount of losses it experienced as a result of Guardsmark's failure to secure the 103rd Street Facility.

On May 28, 1996, Green informed Pietrangelo by letter that Guardsmark was closing its file on the matter because Johnson had failed to respond. The next day Johnson wrote to Green and informed him that Johnson was still gathering evidence.

Guardsmark ceased providing security services at the 103rd Street Facility in June 1996. [3]

[3]  The circumstances regarding the termination of the Guardsmark contract are not set forth in the complaint.

Johnson alleges on information and belief that in June or July 1996 a woman visiting the other Johnson facility that [*8] was protected by Guardsmark complained that one of the Guardsmark guards detained her in the guard's house, forced her into his car and drove away.

Case 1:08-cv-00248    Document 9-2    Filed 01/18/2008    Page 9 of 13

Page 3
1998 U.S. Dist. LEXIS 2491, *

On January 13, 1997, Johnson sent Guardsmark evidence that Guardsmark was to blame for Johnson's losses at the 103rd Street Facility. The evidence included the report of Johnson's investigator, the transcript of the tape-recorded interview with Guerra, an affidavit from Guerra in which he admitted that he knew people were stealing, and the transcript of the tape-recorded conversation with Hill. Johnson requested that Guardsmark compensate it for the theft of over $ 500,000 in product. In response, Guardsmark requested more information.

Johnson filed this action on August 8, 1997, in the Circuit Court of Cook County, Illinois. Guardsmark received the complaint on August 14, 1997, and filed a notice of removal on September 11, 1997. Johnson's complaint sets forth the following eleven counts: breach of a written contract (Count I), in the alternative breach of an oral contract (Count II), in the alternative unjust enrichment (Count III), breach of fiduciary duty (Count IV), fraud (Count V), negligent misrepresentation (Count VI), violation [*9] of the Consumer Fraud and Deceptive Business Practices Act (Count VII), negligent hiring (Count VIII), negligent retention (Count IX), negligent supervision (Count X), and negligence (Count XI). Johnson seeks damages in the amount of approximately $ 518,893.85, the value of the inventory that was stolen from the 103rd Street Facility. Guardsmark has moved to dismiss Counts III through XI.

### Discussion

#### I. Standard

On a motion to dismiss under *Rule 12(b)(6)*, all well-pleaded allegations in the complaint must be taken as true, with all reasonable inferences drawn in the plaintiff's favor. *See Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir. 1994), cert. denied, 516 U.S. 862, 116 S. Ct. 172, 133 L. Ed. 2d 113 (1995).* A complaint may be dismissed only if it is clear that no set of facts consistent with its allegations would entitle the plaintiff to relief. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)* (citing *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).*

#### II. Unjust Enrichment (Count III)

Guardsmark seeks to dismiss Johnson's unjust enrichment [*10] claim on the ground that it is barred by the existence of an express contract between the parties. Johnson responds that its unjust enrichment claim is pled in the alternative to the contract claim and that its allegation of an express contract was not incorporated into that claim.

Guardsmark is correct that under Illinois law a claim for unjust enrichment will not lie where the parties have

an express contract. [4] As the Illinois Supreme Court has explained:

> The theory of unjust enrichment is based on a contract implied in law. To recover under this theory, plaintiffs must show that defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment. Because unjust enrichment is based on an implied contract, "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application."'

*People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill. 2d 473, 607 N.E.2d 165, 177, 180 Ill. Dec. 271* (quoting *La Throp v. Bell Federal Sav. & Loan Ass'n, 68 Ill. 2d 375, 370 N.E.2d 188, 195, 12 Ill. Dec. 565 (Ill. 1977)* (other citations omitted). Given this rule, it is clear that Johnson [*11] has no unjust enrichment claim, for it alleges that existence of an express written contract between itself and Guardsmark. Pleading in the alternative and omitting that allegation from the unjust enrichment claim are insufficient to overcome that bar, for Johnson has alleged a fact that negates the claim. Furthermore, the existence of the written contract is not disputed by Guardsmark, which has attached it as Exhibit A to its counterclaim. [5] While this Court must look only to the pleadings to decide this motion, we need not ignore the obvious and pretend that no contract exists. Count III is dismissed with prejudice.

> 4    The parties have assumed that Illinois law applies to Counts III through XI. Johnson contends that Tennessee law governs its breach of a written contract claim (Count I), but that claim is not at issue on this motion.

> 5    If it were the case here that the existence of an express contract was unclear or contested, an unjust enrichment claim pled in the alternative would be permissible. But where the contract clearly exists, the claim is barred.

#### [*12] III. Breach of Fiduciary Duty (Count IV)

Guardsmark argues that Johnson's breach of fiduciary duty claim must be dismissed because Guardsmark owed no such duty to Johnson. Johnson asserts that while under Illinois law no fiduciary duty exists as a matter of law between a security firm and its client, Illinois does recognize such a duty in specific cases where the plaintiff can establish the requisite level of trust and influence,

1998 U.S. Dist. LEXIS 2491, *

and it contends that it has alleged such a relationship between itself and Guardsmark.

Where no fiduciary duty exists as a matter of law, Illinois law does permit the finding of a fiduciary relationship based upon the particular factual circumstances of the parties' relationship. For such a relationship to exist:

> the plaintiff must plead facts from which a fiduciary relationship arises. For example, the party seeking to establish the relationship must show that he placed trust and confidence in another so that the other gained influence and superiority over him. This degree of trust and confidence can be shown by such factors as degree of kinship, age disparity, health, mental condition, education, business experience [and] extent [*13] of reliance.

*Santa Claus Indus., Inc. v. First National Bank of Chicago, 216 Ill. App. 3d 231, 576 N.E.2d 326, 331, 159 Ill. Dec. 657 (Ill. App. 1st Dist. 1991)* (citations omitted). But where the existence of a fiduciary duty is dependent upon the specific facts of the case, mere trust and confidence alone are insufficient. As the Seventh Circuit has explained:

> The essence of a fiduciary relationship is that one party is dominated by the other. The fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business. The dominant party must accept the responsibility, accept the trust of the other party before a court can find a fiduciary relationship. "[A] slightly dominant business position ... [does] not operate to turn a formal contractual relationship into a confidential or fiduciary relationship."

*Pommier v. Peoples Bank Marycrest, 967 F.2d 1115, 1119 (7th Cir. 1992)* (quoting *Carey Elec. Contracting, Inc. v. First National Bank of Elgin, 74 Ill. App. 3d 233, 392 N.E.2d 759, 763, 30 Ill. Dec. 104 (Ill. App. 2d Dist. 1979))*. Moreover, "in the absence of dominance and influence there [*14] is no fiduciary relationship regardless of the level of trust between the parties." *Lagen v. Balcor Co., 274 Ill. App. 3d 11, 653 N.E.2d 968, 975, 210 Ill. Dec. 773 (Ill. App. 2d Dist. 1995)*. Significantly, absent the requisite dominance and influence, Illinois law does not recognize a fiduciary relationship between contracting parties. *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir. 1992)*.

Johnson has alleged that Guardsmark owed it a fiduciary duty and that it placed its trust and confidence in Guardsmark. (Compl., P 48.) What it fails to allege, and what is lacking from the factual scenario of its allegations, is Guardsmark's dominance and influence over it. The complaint expressly states that Johnson modified the contract before signing it (Compl., P 3), that it hired its own private investigator and undercover "agent" when dissatisfied with Guardsmark's response to the thefts (*see, e.g., id.*, PP 8, 13, 14), and that its officials repeatedly confronted Guardsmark about the thefts and lack of action and demanded changes in Guardsmark's performance (*id.*, PP 15, 16, 20, 21, 27). Those allegations describe [*15] an arm's-length business relationship between contracting parties, not a relationship in which Guardsmark exercised a significant degree of dominance and influence over Johnson. *See Central States Joint Board v. Continental Assurance Co., 117 Ill. App. 3d 600, 453 N.E.2d 932, 937, 73 Ill. Dec. 107 (Ill. App. 1st Dist. 1983)* (facts established that parties negotiated at arm's-length and that defendant did not gain sufficient influence over plaintiff to make plaintiff servient party). Moreover, those allegations make clear that there exists no set of facts Johnson could allege consistent with its own allegations that would establish that Guardsmark owed it a fiduciary duty. *See Oil Express National, Inc. v. Burgstone, 958 F. Supp. 366, 371 (N.D. Ill. 1997)* (allegations contained no facts from which fiduciary relationship could be inferred) (Kocoras, J.). Count IV is therefore dismissed with prejudice as well.

### IV. *Fraud (Count V)*

Guardsmark moves to dismiss Johnson's fraud claim on two grounds: first, that it is not pled with sufficient particularity under Rule 9(b), and second, that Guardsmark's statements of future action and intent are not actionable. Johnson [*16] counters that it has satisfied Rule 9(b)'s standard and that its allegations do not relate to future actions but rather to Guardsmark's fraudulent misrepresentation of its intent to perform. We address the latter contention first, for if true it will require the dismissal of the fraud claim with prejudice.

"As a general rule in Illinois, a promise to perform a future act, even though made without present intention to perform, is insufficient to constitute fraud." *International Meat Co., Inc. v. Bockos, 157 Ill. App. 3d 810, 510 N.E.2d 1013, 1016, 109 Ill. Dec. 945 (Ill. App. 1st Dist. 1987)*. As the Seventh Circuit has explained:

> In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent -- a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the

rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably this is the result that the Illinois rule seeks to avoid.

*Bower v. Jones, 978 F.2d 1004, 1012 (7th* [*17] *Cir. 1992).*

Johnson argues that its allegations are not of future action but go to Guardsmark's false statements regarding its *ability* to secure the 103rd Street Facility and exercise control over its own employees. (Pl.'s Br. at 9.) It also contends that Guardsmark misrepresented then-existing facts regarding its own willingness to taken action as to the thefts and its "then-present intention to control its employees." (*Id.* at 9 n.1.) But whether dressed up as "ability" or "willingness," Johnson's allegations are really nothing more than Guardsmark's statements of intention. As to ability, Johnson does not contend that Guardsmark misrepresented the number of employees it had available or some other tangible inadequacy, but rather that Guardsmark misrepresented its intention to perform satisfactorily. As to willingness, that word is synonymous with "intent" in this context. Johnson has alleged nothing more than that Guardsmark made false representations and promises regarding its own future actions. Its allegations run squarely afoul of the Illinois rule that such statements are not actionable as fraud. Count V is therefore dismissed with prejudice. Because we have decided [*18] this issue against Johnson, we need not consider Guardsmark's argument that Count V is not pled with sufficient particularity under Rule 9(b).

### V. *Negligent Misrepresentation (Count VI)*

Guardsmark argues that Johnson's negligent misrepresentation claim must fail because Guardsmark is not in the business of supplying information, an essential element of such a claim under Illinois law. Johnson responds that it has in fact made that allegation.

In Illinois, a negligent misrepresentation claim will lie only where the defendant is in the business of supplying information. *Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 176 Ill. 2d 160, 679 N.E.2d 1197, 1201, 176 Ill. 2d 160, 223 Ill. Dec. 424 (Ill. 1997).* To make that determination, a two-part inquiry is used. "First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions." *Rankow v. First Chicago Corp., 870 F.2d 356, 362-63 (7th Cir. 1989).* If the information supplied "is merely ancillary to the sale or in connection with the sale of merchandise or other matter," then there is no claim

for negligent [*19] misrepresentation. *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc., 125 F.3d 468, 477 (7th Cir. 1997).*

Johnson alleges that "Guardsmark is in the business of supplying information to its clients for the security of their premises." [6] (Pl.'s Br. at 9; Compl., P 60.) But nowhere does Johnson allege that the information supplied by Guardsmark was supplied for the guidance of Johnson *in its business transactions.* Rather, it is clear that the information was ancillary to Guardsmark's supplying of security services and personnel, which is Guardsmark's actual business. If Guardsmark were a security consultant that evaluated Johnson's facilities in a report that Johnson used to hire others to provide security devices or security, then Johnson might be able to bring a negligent misrepresentation claim against it. But that is not the case here. Guardsmark was hired by Johnson to provide security personnel and services for the 103rd Street Facility, not to provide information about security to Johnson. While it did provide some information on security, that information was ancillary to its provision of security personnel. On these facts Johnson cannot state a negligent misrepresentation [*20] claim against Guardsmark. Count VI is dismissed with prejudice.

> 6   In support of that assertion, Johnson cites to paragraphs 15, 31 and 37 (as well as Paragraph 60, addressed in the text) of its complaint. Paragraph 15 alleges that when confronted by Johnson, Winkelman of Guardsmark admitted that Guardsmark knew that theft was occurring at the 103rd Street Facility and that Guerra had acted incompetently, and that Guardsmark would replace the two guards and monitor the facility around the clock. Paragraph 33 alleges that the written contract required Guardsmark to competently provide security and to exercise control over its personnel. Paragraph 37 alleges that Guardsmark promised to competently provide security and exercise control over its personnel. None of these paragraphs can fairly be read to allege that Guardsmark was in the business of supplying information to Johnson for guidance in its business transactions.

### VI. *Consumer Fraud and Deceptive Business Practices Act (Count VII)*

Guardsmark [*21] seeks the dismissal of Johnson's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), *815 ILCS 505/1 et seq.*, on the ground that Johnson's claim does not implicate consumer protection concerns. Johnson makes a two-pronged response: first, that its claim does implicate consumer protection concerns, and second, that an allegation

of consumer protection concerns is not an essential element of a claim under the CFA.

While Johnson is correct that the implication of consumer protection concerns is not an essential element of a CFA claim, it ignores the fact that the Illinois courts do require such an inquiry where the plaintiff's allegations go to breach of a contract between the parties. *Doherty v. Kahn, 289 Ill. App. 3d 544, 682 N.E.2d 163, 177, 224 Ill. Dec. 602 (Ill. App. 1st Dist. 1997).* "Courts have consistently resisted attempts by litigants to portray otherwise ordinary breach of contract claims as causes of action under the Act." *Lake County Grading Co. v. Advance Mechanical Contractors, Inc., 275 Ill. App. 3d 452, 654 N.E.2d 1109, 1116, 211 Ill. Dec. 299 (Ill. App. 2d Dist. 1995). See also Athey Products Corp. v. Harris Bank Roselle,* [*22] *89 F.3d 430, 436-37 (7th Cir. 1996).*

Johnson asserts that consumer protection concerns are raised by the allegations that Guardsmark employees are stealing from the facilities they are hired to protect, that Guardsmark has a history of such incidents, and that Guardsmark guards kidnaped a person. (Pl.'s Br. at 11, citing Compl., PP 19, 26.) These allegations do not allege "a broad misrepresentation to the public," for they do not set forth a deceptive act or practice by Guardsmark. Rather, they suggest that Guardsmark may be a hazard to its clients and the public, but that is not the sort of consumer protection concern that the CFA is intended address. All potentially criminal behavior is not actionable under the CFA, for the statute requires a *deceptive* practice. That Guardsmark engaged in a deceptive practice that reached the public generally is the essential allegation that is missing from Johnson's complaint. This case falls squarely within the rule addressed in *Doherty.* Count VII is dismissed with prejudice.

## VI. *Negligence Claims (Counts VIII through XI)*

Lastly, Guardsmark contends that all four of Johnson's negligence claims are barred by the economic [*23] loss doctrine. Johnson counters that by seeking compensation for the inventory stolen from the 103rd Street Facility during Guardsmark's tenure there, it is not seeking recovery for economic loss.

In Illinois the economic loss doctrine has its origins in *Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443, 61 Ill. Dec. 746 (Ill. 1982),* in which the Illinois Supreme Court held that solely economic losses are not generally recoverable in tort. The court defined "economic loss" as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits -- without any claim of personal injury or damage to other property." *435 N.E.2d at 449.* It reasoned that the proper remedy for the protection of expectation interests lay in contract. *Id. at 448.*

Although *Moorman* addressed the provision of tangible goods, the economic loss doctrine was subsequently extended to the provision of defective services in *Anderson Elec., Inc. v. Ledbetter Erection Corp., 115 Ill. 2d 146, 503 N.E.2d 246, 249, 104 Ill. Dec. 689 (Ill. 1987).* The Illinois Supreme Court held that "[a] plaintiff seeking to recover purely economic losses [*24] due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Id.* It concluded that an electrical subcontractor's claim that a third-party had negligently inspected the subcontractor's work and required much of it to be redone, increasing the subcontractor's costs, stated a claim for nothing more than the profits the subcontractor lost, or in other words its disappointed commercial expectation. *Id.* As to the applicability of the economic loss doctrine to the provision of services, the Illinois Supreme Court has further explained:

> A provider of services and his client have an important interest in being able to establish the terms of their relationship prior to entering into a final agreement. The policy interest supporting the ability to comprehensively define a relationship in a service contract parallels the policy interest supporting the ability to comprehensively define a relationship in a contract for the sale of goods. It is appropriate, therefore, that *Moorman* should apply to the service industry. Just as a seller's duties are defined by his contract with a buyer, [*25] the duties of a provider of services may be defined by the contract he enters into with his client. When this is the case, the economic loss doctrine applies to prevent recovery of purely economic loss in tort.

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill. 2d 137, 636 N.E.2d 503, 514, 201 Ill. Dec. 71 (Ill. 1994).*

Johnson contends that the economic loss doctrine does not bar its claim for several reasons. For one thing, Johnson argues, Guardsmark owed "extra-contractual" duties to Johnson to employ honest people and to appropriately supervise them, and so tort damages are permissible here. But Johnson has failed to identify the source of those duties. It has cited to no Illinois case law imposing specific duties upon providers of security services to employ honest personnel and to use reasonable care to supervise them. In the absence of such a rule, Guardsmark had no duties to Johnson beyond those imposed by their contract.

1998 U.S. Dist. LEXIS 2491, *

A simple analogy illustrates the fallacy of Johnson's argument. The manufacturer of a defective product that simply does not work properly does not owe a duty in tort to the purchaser of the product to use reasonable **[*26]** care in producing the product. Rather, the purchaser's remedy lies in breach of contract or breach of warranty. Similarly, Johnson's remedy here lies in contract; Guardsmark had no obligation to use reasonable care in performing its duties, for its only obligations arose under the contract itself.

Johnson also contends that its negligence claims fall within the exceptions to the economic loss doctrine for damages proximately caused by the defendant's fraud or negligent misrepresentation. *See NBD Bank v. Krueger Ringier, Inc., 292 Ill. App. 3d 691, 686 N.E.2d 704, 707, 226 Ill. Dec. 921 (Ill. App. 1st Dist. 1997)*. But we have already dismissed Johnson's claims of fraud and negligent misrepresentation for failure to state claims. Therefore, those exceptions have no applicability here.

Johnson asserts that the damages it seeks, namely the value of the inventory stolen during Guardsmark's tenure, does not constitute economic loss because it seeks to recover damages for the loss of its property. But that loss did not occur as the result of a sudden or dangerous occurrence, the third and final exception to the economic loss doctrine. *See id.* Rather, it occurred because Guardsmark **[*27]** did not do properly the job it had been hired to do. In other words, Johnson suffered disappointed commercial expectations, and the value of the property lost because Guardsmark did not provide adequate security services constitutes nothing more than lost profits. Securing the 103rd Street Facility so that Johnson could sell the products manufactured there and make a profit on them was in fact the purpose of the con-

tract with Guardsmark. When Guardsmark breached the contract, Johnson's commercial expectation was disappointed. Johnson has suffered no property damage of the type that would permit recovery in tort. [7] Its negligence claims are barred by the economic loss doctrine, and Counts VIII through XI are therefore dismissed with prejudice.

> 7 The nature of the damages, in this case lost inventory, is not the proper inquiry. If, for example, a Guardsmark employee had accidentally set fire to a building at the 103rd Street Facility, Johnson could recover its damages in tort, including its lost inventory. *See NBD Bank, 686 N.E.2d at 708* ("The proper test for distinguishing between recovery in tort and contract damages (economic losses) depends upon the nature of the defect and the manner in which the damage occurred.") But here Johnson seeks recovery of damages that go to the very purpose of its contract with Guardsmark. The manner in which the damage occurred arises from Guardsmark's breach of the contract.

**[*28]** *Conclusion*

Guardsmark's motion to dismiss Counts III through XI of the complaint is granted in its entirety. Those counts are dismissed with prejudice.

**ENTER:**

Paul E. Plunkett

**UNITED STATES DISTRICT JUDGE**

**DATED:** 2-26-98