# EXHIBIT D

LEXSEE 1999 U.S. DIST. LEXIS 4174

Amato v. Creative Confections Concepts, Inc.

98 C 567

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1999 U.S. Dist. LEXIS 4174*

March 25, 1999, Decided
March 29, 1999, Docketed

**DISPOSITION:** [*1] Nicolet's motion to dismiss for lack of personal jurisdiction GRANTED and Creative's motion to dismiss count II GRANTED without prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** For MICHAEL S AMATO, AMICO INTERNATIONAL, INC., plaintiffs: John L. Malevitis, J. L. Malevitis & Associates, Ltd., Chicago, IL.

**JUDGES:** Blanche M. Manning, U.S. District Court Judge.

**OPINION BY:** Blanche M. Manning

**OPINION**

*MEMORANDUM AND ORDER*

This matter is before the court on motion of defendant Steven S. Nicolet ("Nicolet") to dismiss all counts for lack of personal jurisdiction pursuant to *Fed.R.Civ.P. 12(b)(2)*; on motion of Nicolet to dismiss count I for failure to state a claim upon which relief can be granted pursuant to *Fed.R.Civ.P. 12(b)(6)*; and on motion of defendant Creative Confections Concepts, Inc. ("Creative") and Nicolet (collectively, "defendants") to dismiss count II for failure to state a claim upon which relief can be granted pursuant to *Fed.R.Civ.P. 12(b)(6)*. For the reasons that follow, Nicolet's motion to dismiss for lack of personal jurisdiction is GRANTED, and Creative's motion to dismiss count II is GRANTED without prejudice.

1   As the court finds that it has no personal jurisdiction over Nicolet, the court does not reach Nicolet's motion to dismiss counts I and II for failure to state a claim upon which relief may be granted.

[*2] **BACKGROUND**

The following facts are derived from the allegations in the complaint. Plaintiff Michael S. Amato ("Amato") is an Illinois citizen. Plaintiff Amico International, Inc. ("Amico") is an Illinois corporation. Defendant Creative is a Wisconsin corporation. Defendant Nicolet, a citizen of Wisconsin, is president and shareholder of Creative. All plaintiffs and defendants were in the business of producing and distributing candy.

Between 1991 and 1994, Amato owned 377 stock shares of Creative. On July 29, 1994, Amato entered into a stock redemption/purchase agreement ("Agreement") with defendants wherein Amato would sell to defendants his 377 stock shares in exchange for $ 330,000. The Agreement provided the following division of shares and purchase prices: Creative, 251.337 shares for $ 220,000; Nicolet, 43.650 shares for $ 38,209; Raymond J. Kiely, 63.225 shares for $ 55,345; and Thomas L. Ryan, 18.788 shares for $ 16,446. [2] On July 29, 1994, Nicolet, Mr. Kiely, and Mr. Ryan paid their respective purchase prices to Amato.

2   Mr. Kiely and Mr. Ryan are not named as parties in this matter.

[*3] Creative's purchase price was subject to payments by installment pursuant to the terms of a promissory note ("the Note"). Under the terms of the Note, Creative promised to pay Amato $ 220,000 in twenty-four (24) consecutive monthly installments of principal of $ 9,166.67 commencing on August 29, 1994. Between August 31, 1994 and October 20, 1995, Creative made payments to Amato totaling $ 119,800. The balance of $ 100,200 remains unpaid and is sought after in this action.

[3]

Case 1:08-cv-00248    Document 14-5    Filed 01/18/2008    Page 3 of 10

Page 2
1999 U.S. Dist. LEXIS 4174, *

3   The Note also included a promise to pay reasonable attorneys' fees upon default. Accordingly, Amato seeks such attorneys' expenses here.

Additionally, repayment of the Note was allegedly guaranteed by Nicolet, personally. Such a guarantee, claims Amato, was issued in the form of a document entitled "Personal Guaranty" ("Guaranty"). The Guaranty provided that Amato was not willing to sell his shares of stock in Creative without the undertakings contained in the Guaranty. The Guaranty provided that Nicolet, the "undersigned," as guarantor: [*4]

> unconditionally and irrevocably guarantees to the holder, from time to time, of the Note or of any interest in the Note, the prompt payment of all payments to be made by corporation under the Note, when and as the same become due from time to time, whether by lapse of time, acceleration or otherwise, and at all subsequent times, and unconditionally and irrevocably, guarantees the prompt performance of all of the other terms, covenants and conditions of the Note. 4

Count I of the complaint proceeds on a breach of contract theory against the corporation under the Agreement and Note, and for purposes here, against Nicolet for alleged breach of the Guaranty.

4   In addition, the Guaranty provided that the Guarantor would pay all expenses and fees, including attorneys' fees, which might be incurred by the holder of such Note, in enforcing any of the terms or provisions of this Guaranty.

Next, according to Amato, on December 7, 1994, Creative, through its president, Nicolet, forged Amato's signature [*5] to a document entitled "Election to Close Books Upon Termination of Interest by S Corporation Shareholder" ("Election document"). The Election document purported to shift the tax burden from the corporation itself to the shareholders individually. Thus, with Amato's alleged signature affixed to the Election document, along with the other shareholders' signatures, Amato was subject to unexpected and unconsented tax payments. Count II of the complaint seeks recompense for "the amount of damage suffered by [Amato] as a result of the fraudulent conduct of defendants."

Count III of the complaint asserts that in May, 1997, plaintiffs entered into a contract with Creative to provide Creative with candy packaging supplies. Between May, 1997 and November, 1997, plaintiffs sold and delivered supplies to Creative in the amount of $ 93,937.59. Creative has not paid plaintiffs any amount on the contract for such goods. It was allegedly agreed that Creative's payment for these supplies would, "in no event, ... go beyond the period of one year." Plaintiffs' count III seeks the amount of $ 93,937.59 together with interest thereon at the rate of 9% per annum from May, 1997, as well as costs for [*6] this suit. 5

5   As count III does not charge Nicolet with the breach of contract, only Creative, the court needs not undertake a 12(b)(2) or 12(b)(6) analysis of count III.

## DISCUSSION

Defendants present three arguments pursuant to *Rule 12* to dismiss this matter. First, Defendant Nicolet moves the court to dismiss the entire complaint as he is not subject to personal jurisdiction in the state of Illinois. Next, Nicolet moves the court to dismiss for failure to state a claim with respect to Amato's breach of contract claim because Amato's exhibit of the Guaranty does not contain Nicolet's signature evidencing any obligation undertaken by Nicolet. Thus, the statute of frauds would bar Amato's claim. Finally, defendants Nicolet and Creative join to move this court to dismiss for failure to state a claim with respect to Amato's fraud claim based on forgery because Amato has not pleaded "reliance" upon defendants' alleged misrepresentation. The court will address each argument in turn.

### I. PERSONAL JURISDICTION

[*7] In considering a motion to dismiss for lack of personal jurisdiction under *Fed.R.Civ.P. 12(b)(2)*, the plaintiff bears the burden of demonstrating that jurisdiction is proper in this forum. See *McIlwee v. ADM Industries, Inc., 17 F.3d 222, 223 (7th Cir. 1994)*. All factual allegations in the plaintiff's complaint are accepted as true unless controverted by the defendants' affidavits. *Turnock v. Cope, 816 F.2d 332, 333 (7th Cir. 1987)*. The court must resolve all factual disputes in favor of the plaintiff. *Saylor v. Dyniewski, 836 F.2d 341, 342 (7th Cir. 1988)*.

Where, as here, the court's subject-matter jurisdiction stems from diversity of citizenship, the court has power to exercise personal jurisdiction over a defendant only if personal jurisdiction is proper in an Illinois state court. *Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc. 15 F.3d 721, 724 (7th Cir. 1994)*. Under Illinois law, the plaintiff must show that personal jurisdiction complies with: (1) the Illinois long-arm statute; (2) the Illinois state constitution; and (3) federal constitutional law. *RAR, Inc. v. Turner Diesel, Ltd. 107 F.3d 1272, 1276 (7th Cir. 1997)*. Because the Illinois long-

arm [*8] statute confers personal jurisdiction on any basis authorized under the Illinois and federal constitutions, the court must find only that the Illinois long-arm statute is satisfied in a manner consistent with the state and federal constitution. *Id.*

Under the Illinois long-arm statute, Illinois state courts have general jurisdiction over nonresident defendants "doing business" in Illinois, and specific jurisdiction over non-resident defendants if the claims arise from their "transactions" in Illinois. 735 ILCS 5/209(a) & (b). The Illinois long-arm statute also contains a "catch-all" provision which allows Illinois state courts to assert personal jurisdiction to the maximum extent permitted by the Illinois and United States Constitutions. *735 ILCS 5/2-209(c)*. Thus, jurisdiction is co-extensive with federal due process requirements. *See, e.g., Dehmlow v. Austin Fireworks, 963 F.2d 941, 945 (7th Cir. 1992)*.

To determine whether personal jurisdiction over Nicolet is proper, the court must consider: (1) whether the Illinois long-arm statute grants jurisdiction; and whether this court's assertion of jurisdiction is consistent with (2) the Illinois and (3) United States Constitutions. [*9] *RAR, Inc., 107 F.3d at 1276*. As the Seventh Circuit recently explained, "because the Illinois statute authorizes personal jurisdiction to the constitutional limits, the three inquiries mentioned above collapse into two constitutional inquiries-one state and one federal." *Id.* Thus, the court proceeds to consider both federal and Illinois due process to determine whether jurisdiction is proper. If jurisdiction is not proper under either federal or Illinois due process, this court cannot exercise proper jurisdiction over Nicolet.

### A. Illinois Due Process

The Illinois Supreme Court has indicated that where the exercise of jurisdiction over a non-resident, non-consenting defendant is at issue, an Illinois court must look beyond federal due process guarantees and the "literal textual descriptions" specific in Illinois' long-arm statute. *Rollins v. Ellwood, 141 Ill. 2d 244, 271, 565 N.E.2d 1302, 1314, 152 Ill. Dec. 384, 396 (1990)*. However, Illinois courts provide little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction. [6] The Illinois Supreme Court instructs that "jurisdiction is to be asserted only [*10] when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Id.* Beyond this, the Illinois courts have provided little case law with which to work.

---

6   The Illinois Constitution provides that "no person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." *Ill. Const. art. 1, § 2.*

Illinois courts have upheld personal jurisdiction "over a non-resident corporate purchaser engaged in a commercial relationship with an Illinois corporation through the placing of purchase orders to the plaintiff in Illinois for products manufactured in Illinois." *RAR, Inc., 107 F.3d at 1277* (quoting *Autotech Controls Corp. v. K.J. Electric Corp., 256 Ill. App. 3d 721, 727, 628 N.E.2d 990, 995-96, 195 Ill. Dec. 526, 531-32 (1st Dist. 1993))*. See also *G.M. Signs, Inc. v. Kirn Signs,* [*11] *Inc., 231 Ill. App. 3d 339, 596 N.E.2d 212, 214-15, 172 Ill. Dec. 933, 935-36 (1992)*. However, these cases involve causes of action arising directly from the Illinois commercial relationship. The critical issue in this case is how closely related a cause of action must be to such a commercial relationship to justify personal jurisdiction in that action. As noted in *RAR*, Illinois case law is scant on this issue. *Id.* Therefore, the court will consider the federal constitutional issues directly. *Id.*

### B. Federal Due Process

Federal due process requires that the exercise of personal jurisdiction over a nonresident defendant be reasonable. *International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The non-resident defendant must have "minimum contacts" with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 342, 85 L. Ed. 278 (1940))*. Generally, courts consider the due process analysis as a two-part inquiry asking whether minimum contacts exist, and if so, whether the exercise [*12] of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See Glass v. Kemper Corp., 930 F. Supp. 332, 338 (N.D. Ill. 1996)*.

"Minimum contacts" are those acts by which a defendant "purposefully avails [himself] of the privilege of conducting activities within the forum." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958)*. The defendant's purposeful availment shall be such that he should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)*.

Federal due process may be proper where the court has personal jurisdiction, general or specific. General jurisdiction applies when the case neither arises from nor is related to the defendant's contacts with the forum, and is permissible only if the defendant has "continuous and systematic general business contacts" with the forum.

Case 1:08-cv-00248   Document 14-5   Filed 01/18/2008   Page 5 of 10

Page 4
1999 U.S. Dist. LEXIS 4174, *

*107 F.3d at 1277* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)). Specific jurisdiction, on the other hand, applies when the court is asserting jurisdiction [*13] over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Id.* (citing *Helicopteros*, 466 U.S. at 416). In any event, "maintenance of the suit [must] not offend the traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316 (citation omitted).

### i. General Jurisdiction

General jurisdiction applies when the case neither arises from nor is related to the defendant's contacts with the forum and is permissible only if the defendant has "continuous and systematic general business contacts" with the forum. *RAR, Inc.*, 107 F.3d at 1277 (citing *Helicopteros*, 466 U.S. at 414 n.8. The contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." *International Shoe Co.*, 326 U.S. at 318. This is a fairly high standard requiring a great amount of contacts, but permits the court to include in its analysis contacts with no relationship to the underlying dispute. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1243 (7th Cir. 1990). For the court to properly exercise [*14] general jurisdiction over Nicolet, Nicolet's contacts with Illinois need not relate to Amato's breach of contract or fraud claim, but they must be continuous, systematic, and substantial. *See Helicopteros*, 466 U.S. at 416.

Nicolet's contacts with Illinois are few. Nicolet met with Amato a few times on an Illinois Tollway Plaza Oasis in the natal stages of Creative; visited three candy plants in Illinois in 1992 and 1994; had some "contact" with two co-packaging companies in Illinois between 1992 and 1996; and called into Illinois from Wisconsin on occasion to discuss Creative's general business. Amato reminds the court that Creative manufactured candy and packaged 90% of its products and marketing displays in Illinois. On this record, Nicolet's contacts with Illinois are only sporadic, i.e., not "continuous, systematic, [or] substantial." *See Id.*

As Judge Alesia stated in a similar case in this district, *Glass v. Kemper Corp.*, 930 F. Supp. 332, 338-39 (N.D. Ill. 1996), [7] "courts have found lack of general jurisdiction over nonresident defendants based upon much greater contacts with the forums than [Nicolet] had with Illinois. *See, e.g., Helicopteros*, 466 U.S. [*15] at 411 (no general jurisdiction where nonresident defendant negotiated contract in forum; purchased 80 percent of its helicopter fleet, spare parts, and accessories from company in forum state; sent pilots to forum state for training and to bring helicopters to South America; sent management and maintenance personnel to forum state for 'plant familiarization' and technical consultation; and received over $ 5 million in payments drawn upon bank in forum state); *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (no general jurisdiction where defendant advertised in forum state; mailed brochures and paid commissions to travel agents in forum state; and sold vacation cruises to residents of forum state); *Obermeyer v. Gilliland*, 873 F. Supp. 153, 157-58 (C.D. Ill. 1995)(no general jurisdiction in Illinois where defendant truck driver, as his only route, regularly drove truck from Michigan to Illinois and was en route to Illinois when accident occurred in Michigan)." Also, like the managing director in *Glass*, Nicolet asserts that he never lived in or owned real estate in Illinois; maintains no office in Illinois; has never paid an Illinois income tax; and never [*16] voted in Illinois. *See Id.* In light of the inconsistent and tenuous contact that Nicolet had with the state of Illinois, the court finds that it has no general jurisdiction over Nicolet. The court now turns to consider whether the court has specific jurisdiction over Nicolet.

> 7  In *Glass*, 930 F. Supp. at 338, no general jurisdiction was found where defendant managing director's contacts with Illinois included one interview with defendant corporation; attendance at board meetings held in Illinois several times per year for one or two days at a time; occasional telephone calls and letters written to Illinois; and holding of banking account in Illinois.

### ii. Specific Jurisdiction

In specific jurisdiction cases, courts in this district are instructed to decide whether a defendant "'has purposefully established minimum contacts within the forum State,' and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances." *RAR, Inc.*, [*17] 107 F.3d at 1277 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77, 105 S. Ct. 2174, 2184-85, 85 L. Ed. 2d 528 (1985)). Critical to the minimum contacts analysis is showing that the defendant "should reasonably anticipate being haled into court [in the forum State]." *Id.* (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297). A defendant should reasonably have such an expectation where that defendant has "purposefully availed itself of the privilege of conducting activities" in the forum State. *Id.* (quoting *Hanson*, 357 U.S. at 253).

Amato contends that since Nicolet has made numerous visits to Illinois on behalf of Creative, attended Illinois meetings related to Creative in the early stages of the partnership and corporate formation, and held several telephonic meetings from Wisconsin to Illinois, Nicolet has made the requisite "minimum contacts" with Illinois to subject him to the court's jurisdiction. However, spe-

cific jurisdiction, as noted above, must "arise out of" or "be related to" the minimum contacts with the forum State. *Id.* Nicolet argues that despite any prior contact with Illinois (which was made solely on behalf of Creative), no [*18] such contact was made with respect to the instant matters of breach of contract and fraud regarding the Agreement, Note, Guaranty, and Election document. As such, Nicolet avers, these minimum contacts are unrelated to this action, and no personal jurisdiction exists concurrent with the federal constitution.

The court turns to *RAR* for guidance on this difficult legal issue of "how closely connected a cause of action must be to a defendant's contacts with a forum to justify personal jurisdiction over the defendant in that forum." *RAR, Inc., 107 F.3d at 1274*. RAR, Inc. was an Illinois corporation in the engine parts business. *Id.* Between 1991 and 1993, RAR, Inc. sold numerous parts on numerous occasions to Turner Diesel, Ltd., a Scottish corporation. *Id.* In 1993, RAR, Inc. purchased four engines from a third party in Scotland. RAR made the following contract with Turner: Turner would purchase and dismantle various engine parts, assist in packaging the engines in Scotland, and then ship them to a Detroit subsidiary of RAR. *Id.* Pursuant to the contract, Turner shipped the engines to RAR in Detroit. *Id.* Damage to the engines, however, occurred during shipment. [*19] *Id.* RAR filed suit against Turner for breach of contract alleging improper packaging. *Id.* Turner moved for dismissal claiming that the Illinois federal district court lacked personal jurisdiction over Turner. The district court granted Turner's motion to dismiss "because Turner's prior contacts with Illinois had no substantive bearing on this action or on the contract at issue." *Id.* The Seventh Circuit affirmed. *Id.*

In its decision, the Seventh Circuit noted that Turner had no offices, employees, or bank accounts in Illinois, and it did not manufacture products for general sale in Illinois. *Id. at 1275*. The prior contacts between RAR and Turner were described as follows:

> On at least 100 occasions, Turner asked RAR to submit its best price on engines or engine parts that Turner wanted to purchase. Turner would typically fax its request for bids to RAR, or Turner would send representatives to meet personally with RAR's sales representative in Illinois. These bids led to more than 20 separate contracts for the sale of engine parts from RAR to Turner. RAR would usually send the parts from Illinois to wherever Turner wanted the parts." *Id. at 1275.*

RAR [*20] argued that Turner's repeated contacts with RAR in Illinois between 1991 and 1993 evidenced the existence of a long-term commercial relationship sufficient to meet the minimum contacts test. The Seventh Circuit admitted that "RAR's suit is, in a certain sense, related to Turner's contacts with Illinois, if only because Turner never would have come to handle the engines in Scotland had it not previously dealt with RAR in Illinois." *Id.* The Court explained that it did not "think, however, that using such a loose causal connection between a suit and a defendant's forum contacts as the basis for personal jurisdiction comports with fair play and substantial justice." Rather, the court cited to *Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995)*, where that court noted that specific jurisdiction is not appropriate "merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state."

The *RAR* Court concluded that "in a breach of contract case, it is only the 'dealings between the parties in regard to the disputed contract' that [*21] are relevant to minimum contacts analysis." *107 F.3d at 1278* (quoting *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 153 (3d Cir. 1996))*. The *RAR* Court went on to explain:

> Even that line will not always be a bright one. Real world commercial interactions are rarely neatly-compartmentalized by particular contract. When parties engage in an ongoing commercial relationship involving repeated transactions over time, it may be difficult to say exactly which past dealings, or other interactions could have some connection to a number of contracts between the parties. To be relevant for personal jurisdiction, however, past contacts involving the forum state should either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract. Applying any less substantive of a standard would divorce due process analysis from considerations of a state's proper interest in regulating conduct and adjudicating disputes. *Id.* (citations omitted)

Here, the causes of action against Nicolet, personally, are (1) a breach of contract claim based on an alleged personal guaranty made by Nicolet [*22] to answer for the debt of Creative with respect to its obliga-

Case 1:08-cv-00248   Document 14-5   Filed 01/18/2008   Page 7 of 10

Page 6
1999 U.S. Dist. LEXIS 4174, *

tions set forth in the Agreement and Note; and (2) fraud based on the alleged forgery of Amato's signature on the Election document which caused damages to be sustained by Amato resulting from unauthorized tax burdens. Amato's affidavit asserts the following:

> 4. In November of 1991, Mr. Nicolet and Mr. Amato, along with Mr. Dave Michalak, started a new business called Creative Confection Concepts. In November of 1991, various conversations took place between plaintiff and defendant Nicolet and Mr. Michalak at the Lake Forest Oasis Toll Plaza, at or near I-294 North and Illinois Route 60. During these conversations which took place during the aforementioned time period, the parties negotiated ownership of the company, division of profits and discussed operation of the new business venture.
>
> 5. In May of 1992, defendant brought in a new partner, Mr. Thomas L. Ryan. The four partners, plaintiff, defendant, Mr. Michalak and Mr. Ryan, held meetings once a week at the same Toll Plaza oasis mentioned above to discuss their new candy business venture.
>
> 6. Additionally, plaintiff, defendant, Mr. Michalak and Mr. Ryan [*23] all conversed from their respective residences to discuss their candy business many times a week during the following year of 1992 and continuing until July of 1994. During this time period when multiple telephone conversations were taking place over the course of the years, and their candy company business and operation was discussed, the plaintiff was a resident of Illinois, defendant was a resident of [] Wisconsin, Mr. Michalak was a resident of Illinois and Mr. Ryan was a resident of Wisconsin.
>
> 7. In addition to these regular meetings held at the Lake Forest Toll Plaza Oasis in Lake Forest, Illinois, defendant made numerous visits to Gamon International in Elk Grove, Illinois and Amico International Inc. in Bloomingdale, Illinois, for new products, packaging ideas and samples for their new venture Creative [] during 1992 and continuing until July of 1994. Defendant also made visits to Crunchkins Candy Company, also located in Illinois, to sample new candy products made for Creative [], as Crunchkins was one of its candy manufacturers.
>
> 8. It is important to note that the manufacturing of candy for Creative [] did not take place in the State of Wisconsin, as said [*24] company did not have a factory located in the State of Wisconsin. On the contrary, in 1993 continuing into 1994, candy product of Creative [] was manufactured by Ferrara Pan Candy Company, located in Forest Park, Illinois. Additionally, candy product made for Creative [] also was manufactured by Blueberry Confections Company located in Southern California from 1992 through 1994.
>
> 11. Defendant Nicolet also had contact with and utilized two other co-packagers that he did business with in Illinois for the benefit of Creative []. The first was C.P.C. packaging which packaged, sealed and displayed Creative['s] [] products. The second was Illinois Toy Company, also located in Illinois, which made plastic molds for toys included with Creative['s] [] products. These transactions took place from 1993 and continued through 1996. Defendant Nicolet met with representatives of these two companies on numerous occasions in Illinois concerning production of Creative['s] [] products on a continuous basis from 1993 and 1996.

Viewing these alleged contacts with Illinois in a light most favorable to Amato, Nicolet's prior contacts with Illinois are not related to the causes [*25] of action here. Admittedly, Nicolet took part in various meetings in Illinois "for the benefit of Creative." Regardless, these contacts shed little light on the Agreement, Note, alleged Guaranty, or Election document at issue here. And in turn, the contracts at issue here have no substantial connection with Illinois. Nicolet alleges, and Amato does not dispute, that he made no contacts with Illinois related to the Agreement. In fact, it is undisputed that the Agreement was negotiated, drafted and signed by all parties in Wisconsin. The Election document, too, was executed by all parties in Wisconsin. Amato does not dispute this either.

In conclusion, the court finds that Nicolet's alleged past contacts with Illinois, as alleged by Amato, neither "bear on the substantive legal dispute between the parties nor inform the court regarding the economic substance of

the contract." *RAR, 107 F.3d at 1278.* Accordingly, the court cannot say that as a result of his contacts with this forum, Nicolet reasonably should have anticipated being haled into court in Illinois. This court holds that asserting personal jurisdiction over Nicolet in this cause of action would violate the fundamental dictates [*26] of federal due process. [8]

> 8 In finding that Amato has not met his burden to show sufficient minimum contacts with Illinois to warrant personal jurisdiction over Nicolet, the court needs not address whether exercising jurisdiction over Nicolet would also comport with "fair play and substantial justice." *Vetrotex, 75 F.3d at 154 n.9* (citations omitted).

The court also notes that under Illinois due process, "jurisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins,* 141 Ill. 2d at 275, 565 N.E.2d at 275. In light of the court's finding that Nicolet's contacts with Illinois are sporadic, tenuous, and insignificant to this cause of action, it follows that it would not be "fair, just, and reasonable" for Nicolet to defend this action in Illinois. Accordingly, the court finds that jurisdiction [*27] is improper under Illinois and federal due process.

For the foregoing reasons Nicolet's motion to dismiss for lack of personal jurisdiction is granted as to Counts I and II of the plaintiffs' complaint. Therefore, all other issues concerning Nicolet are moot. The court considers the remaining issues as they relate only to Creative.

## II. COUNT II: FRAUD

Count II of Amato's complaint is entitled "Fraud." According to Amato, Creative, via Nicolet, defrauded Amato by forging Amato's signature on the Election document. Amato claims an unconsented, unauthorized pass-through tax obligation was placed on Amato because of the forgery. To establish a claim for fraud under Illinois or Wisconsin law, a plaintiff must plead (1) that the defendant made a false statement of material fact; (2) with knowledge or belief that the statement was false; (3) with an intention to induce the plaintiff to act; (4) and the plaintiff acted in reasonable reliance upon the truth of the statement; (5) to his detriment or damage. [9] *Lagen v. Balcor Co.,* 274 Ill. App. 3d 11, 17, 653 N.E.2d 968, 972-73, 210 Ill. Dec. 773, 777-78 (2nd Dist. 1995)(citing *People ex rel Hartigan v. E & E Hauling, Inc.,* [*28] 153 Ill. 2d 473, 490, 607 N.E.2d 165, 180 Ill. Dec. 271 (1992)); *International Milling Co. v. Priem* (1923), 179 Wis. 622, 624, 192 N.W. 68.

> 9 The parties both present definitions of fraud under Illinois law. Regardless, Illinois and Wisconsin law governing common law fraud is substantially similar. Thus, the court need not address Illinois' conflict-of-law rules on this motion, and proceed under Illinois law on this issue.

Amato asserts the following:

> 4. Plaintiff, a shareholder owning stock during the taxable year ending December 31, 1994, did not consent to the election of the corporation under IRS § 1377(a)(2) to have the rules under the IRS § 1377(a)(1) apply as if the taxable year consisted of two taxable years.
>
> 5. Defendants' representation that plaintiff consented to the election of the corporation under IRS § 1377(a)(2) to have the rules under IRS § 1377(a)(1) apply as if the taxable year consisted of two taxable years was a false statement of fact and was made by defendants with [*29] knowledge of its falsity.
>
> 6. Defendants' representation . . . was material.
>
> 7. Defendants' representation . . . was made by defendants in order to give the defendant corporate tax relief and put the onus of taxes on plaintiff.
>
> 8. As a result of defendants' representation . . . plaintiff has been damaged.

Amato effectively sets forth that Creative made a false statement of material fact (via the forgery) knowing it to be false with the intent to cause Amato to pay unauthorized taxes, and that as a result Amato has been damaged in the form of the tax burden. However, as Creative argues, Amato does not claim that he "acted in reasonable reliance upon the truth of the statement." Accordingly, Creative avers that Amato cannot maintain the count II fraud claim.

In *Caplan v. International Fidelity Ins. Co.,* 885 F. Supp. 175, 177 (N.D. Ill. 1995), plaintiff shareholder filed an action for fraud against Fidelity, an insurance company. According to plaintiff, Fidelity, the company in which plaintiff held stock shares, utilized a third party to divest plaintiff of his ownership in the stock. *Id.* Plaintiff alleged the following scheme: Fidelity made a bogus offer [*30] to purchase plaintiff's stock holding, while a

Case 1:08-cv-00248   Document 14-5   Filed 01/18/2008   Page 9 of 10

Page 8
1999 U.S. Dist. LEXIS 4174, *

"dummy" third party falsely asserted ownership in plaintiff's stock. *Id.*

In considering Fidelity's motion to dismiss pursuant to *Rule 12(b)(6)*, the court found that plaintiff had pleaded himself out of court. *Id. at 179*. Plaintiff had admitted in his complaint that he did not rely on Fidelity's misrepresentation, a necessary element of fraud under Illinois law. *Id. at 178-79*. With no allegation of reliance upon the misrepresentation, the *Caplan* court concluded that "what defendant allegedly did may be actionable as another kind of tort, but it was not common law fraud." *Id. at 179*.

Amato argues that his claim is predicated on actual fraud, and fraudulent misrepresentation, and deceit. Under these characterizations, Amato insists that such claims brought under Illinois law need not present reliance upon any misrepresentation. The court's review of Illinois case law, however, revealed no cases that set forth the elements of actual fraud excepting reliance upon an alleged misrepresentation. *See Hirsch v. Feuer, 299 Ill. App. 3d 1076, 1085, 702 N.E.2d 265, 272, 234 Ill. Dec. 99, 106 (1st Dist. 1998); Soules v. General* [*31] *Motors Corp., 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601, 37 Ill. Dec. 597, 599 (1980)*. In Illinois, fraud has many different names, but they require the same elements, including, particularly, reliance upon the alleged misstatement. *See Farmer City State Bank v. Guingrich, 139 Ill. App. 3d 416, 425, 487 N.E.2d 758, 764, 94 Ill. Dec. 1, 7 (4th Dist. 1985)*(actual fraud); *Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 496, 675 N.E.2d 584, 221 Ill. Dec. 389 (1996)*(common law fraud); *Gerill Corp. v. Jack L. Hargrove Builders, Inc., 128 Ill. 2d 179, 193, 538 N.E.2d 530, 131 Ill. Dec. 155 (1989)*(fraudulent misrepresentation); *Sims v. Tezak, 296 Ill. App. 3d 503, 509, 694 N.E.2d 1015, 1019, 230 Ill. Dec. 737, 741 (1st Dist. 1998)*(fraud); *Shofstall v. Allied Van Lines, Inc., 455 F. Supp. 351, 360 (N.D. Ill. 1978)*(deceit). In fact, one Illinois case explains that the "word 'fraud' has an accepted legal definition [and] to state a cause of action for fraud, a party must establish, inter alia, that a person made a false statement of material fact and that the aggrieved party justifiably relied on the truth of the statement." *People v. Bartlett, 294 Ill. App. 3d 435, 438,* [*32] *690 N.E.2d 154, 156, 228 Ill. Dec. 845, 847 (2nd Dist. 1998)*(citing *Barille v. Sears Roebuck & Co., 289 Ill. App. 3d 171, 176, 682 N.E.2d 118, 224 Ill. Dec. 557 (1997)*).

In a dim light turned on by Amato, one case leans for consideration. In *Application of Busse, 124 Ill. App. 3d 433, 435, 464 N.E.2d 651, 653, 79 Ill. Dec. 747, 749 (1st Dist. 1984)*, plaintiff agreed to sell real property to defendants. The purchase price was $ 225,000. *Id.* The contract provided for a cash payment of $ 65,000 at closing and the balance of $ 160,000 as set forth in a note, secured by a part-purchase mortgage, to be paid in three installments. *Id.* Defendants, unbeknownst to plaintiff, amended the note and trust deed which effectively subordinated plaintiff's security interest in the property to that of a bank who, relying on the amended deed, loaned money to defendants. *Id. at 436-37, 464 N.E.2d at 654*.

When plaintiff discovered his junior security interest, he filed an action in Illinois state court, including a fraud claim. *Id.* At bench trial, the court, in part, granted judgment for plaintiffs for $ 160,000 with interest from the date of closing "for obtaining the property [*33] of the plaintiffs by actual fraud," and granted punitive and exemplary damages of $ 50,000 for the actual fraud committed by defendants. *Id. at 437, 464 N.E.2d at 655*. On appeal, the Illinois Appellate court was limited to the issue of whether plaintiffs failed to prove actual damages to sustain an action for fraud, thus considering whether the trial court erred in awarding punitive and exemplary damages. *Id. at 438, 464 N.E.2d at 655*.

Although Amato contends that his situation is similar to that of plaintiffs in *Busse*, i.e., the defendants' misrepresentation to a third party (lender bank/IRS) caused plaintiff to incur personal liability (compromise of senior security interest/tax obligations), the *Busse* opinion is devoid of any application of the elements of actual fraud. In other words, *Busse* does not confront the bedrock issue of whether a valid actual fraud claim had been set forth in the pleadings with or without a showing of reliance upon the misrepresentation.

Amato apparently asks us to assume that in *Busse*, plaintiffs were not required to show that they relied upon the misrepresentations of the defendants to the bank which later caused the injury [*34] to plaintiffs. However, such an inference is too tenuous given the exhaustive Illinois case law that requires reliance as an element. The court could just as easily assume that the *Busse* plaintiffs did properly plead reliance. The court could assume plaintiff alleged reliance upon defendants' misrepresentations that the note and deed were drafted according to the specific terms all parties agreed upon in earlier dealings. However, the court simply does not know the facts from the record relied upon by Amato. Accordingly, the court must defer to Illinois' plethoric case law which requires a plaintiff to allege that he relied on the truth of the misstatement.

Amato's claim also fails because he does not allege that Creative made the alleged misrepresentation for the purpose of causing Amato to act. *See Hoopla Sports and Entertainment, Inc. v. Nike, Inc., 947 F. Supp. 347, 358 (N.D. Ill. 1996)*. Amato summarily alleges that Creative forged his name to the Election document; misrepresented to the IRS Amato's consent to a change in corporate tax status; and Amato suffered some greater unau-

Case 1:08-cv-00248　　Document 14-5　　Filed 01/18/2008　　Page 10 of 10

Page 9
1999 U.S. Dist. LEXIS 4174, *

thorized tax exposure. Amato's claim, however, is not sufficient to withstand Creative's motion [*35] to dismiss. As Judge Castillo noted in *Hoopla, 947 F. Supp. at 358*, "the cause of action for common law fraud in Illinois does not encompass an action in which A makes misrepresentations to B, but it is C . . . that is injured." *See also Hoppla, 947 F. Supp. at 358* (citing *Fink v. DeClassis, 745 F. Supp. 509, 513 (N.D. Ill. 1990)*(dismissing fraud claim where plaintiff did not allege the defendant's intent to cause plaintiff to act); *Derson Group, Ltd. v. Right Management Consultants, Inc., 683 F. Supp. 1224, 1231 (N.D. Ill. 1988)*(dismissing fraud claim where plaintiff could not allege that defendants' misstatements had caused it to take some affirmative action); cf. *Latigo Ventures v. Laventhol & Horwath, 876 F.2d 1322, 1326 (7th Cir. 1989)*("Where misrepresentations are made but not relied on directly or indirectly . . ., a plaintiff in a fraud case cannot show that he was harmed by them")). It follows, here, that no cause of action for fraud may be advanced where Creative (A) makes misrepresentations to the IRS (B), but it is Amato (C) who is injured. *See Id.*

Illinois law directs that where fraud is plead, the allegations must be set forth with specificity [*36] and particularity. *See Feuer, 299 Ill. App. 3d at 1085, 702 N.E.2d at 272*. Amato has not set forth the requisite elements to sustain a claim for fraud in this action. The court will grant Creative's motion to dismiss without prejudice.

## CONCLUSION

For the reasons set forth above, the court grants Nicolet's motion to dismiss for lack of personal jurisdiction, and grants Creative's motion to dismiss count II without prejudice. Amato may amend count II of his complaint as it relates to Creative, accordingly, no later than April 16, 1999. Creative must answer or otherwise plead no later than April 30, 1999. Should Amato fail to file and serve an amended complaint by the date set forth above, the dismissal shall convert, without further notice, to a dismissal with prejudice.

Enter:

**Blanche M. Manning**

**U.S. District Court Judge**

　　Date: 3/25/99