## TRADING ADVISORY AGREEMENT

THIS TRADING ADVISORY AGREEMENT (this "Agreement") is entered into as of July 1, 2006, by and between Evergreen Energy Capital, LLC, a Delaware limited liability company (the "Advisor"), and Three Zero Three Capital Partners, LLC, an Illinois limited liability company ("303"), which is registered with the Commodity Futures Trading Commission and National Futures Association as a Commodity Pool Operator and Commodity Trading Advisor, and is also the managing member of 303 Energy Trading Alliance, LLC (the "Fund") (collectively with 303, the "Client").

WHEREAS, the Client wishes to invest on its own behalf and on behalf of possible other investors, in the trading of energy futures and futures options, OTC products, and related cash contracts in the manner and on the terms stated below (collectively, "Investment Products");

WHEREAS, the Advisor has experience in operating trading programs and providing trading advisory services with respect to Investment Products; and

WHEREAS, the Advisor has agreed to provide such trading advisory services for the Fund;

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Appointment of the Advisor</u>.

    (a) The Client hereby appoints the Advisor, and the Advisor hereby accepts such appointment, as its agent and attorney-in-fact with respect to the management of certain of the Fund's assets (the "Assets"). The Advisor shall have the authority to purchase and sell Investment Products through the use of the Assets at its discretion, provided that the Advisor shall trade the Assets in accordance with the trading program attached hereto as Exhibit A and incorporated herein by reference (the "Trading Program").

    (b) The Advisor shall perform its obligations hereunder in a manner which, in the reasonable judgment of the Advisor, is designed to achieve the investment objectives of the Fund, and which is consistent with the aforesaid Trading Program.

    (c) In the event that the Advisor wishes to change its Trading Program or use a trading program or programs other than or in addition to the Trading Program in connection with its trading of the Assets, either in whole or in part, it may do so only after giving the Client advance written notice of its intention to do so and only if the Client has consented thereto in writing.

2. <u>Maintenance of the Assets</u>. The Assets shall be maintained in one or more accounts (the "FCM Accounts") with futures commission merchants (the "FCMs"),

**EXHIBIT A**

commodity dealers (the "Dealers"), exempt commercial markets (the "ECMs"), or registered broker/dealers (the "Broker/Dealer") which shall be selected by the Client. The Client shall be responsible for the selection and retention of the FCMs, the Dealers, the ECMs and the Broker/Dealer for the payment of any fees, costs or expenses associated with the services to be provided by such entities in connection with the trading activities of the Advisor, and the Advisor shall have no liability to the Client for any loss, damage, cost or expense arising out of or related to the use of any such FCM, Dealer, ECM, Broker/Dealer or bank as a custodian of the Assets, or for the payment of any fees or margin related to such trading or custody arrangements, all of which shall be the responsibility of the Client.

3. <u>Obligations of the Advisor</u>. In addition to the foregoing, the Advisor shall have the following obligations with respect to its trading of the Assets:

(a) Using its best efforts to assure that the Client is able to obtain prompt oral summaries of all transactions effected by the Advisor hereunder at various times during each trading day;

(b) Assisting the Client, the FCMs, Dealers, ECMs, Broker/Dealers and/or Executing Brokers (as described below) in the reconciliation of any discrepancies between the reports provided to the Client regarding transactions effected by the Advisor hereunder and the reports of such transactions furnished by the FCMs, the Dealers, the ECMs or Broker/Dealers;

(c) The Client will approve all OTC and listed Executing Brokers selected by the Advisor, and the Advisor shall use its best efforts to assure that all selected brokers provide prompt, accurate and satisfactory execution services. The Client shall be responsible for the payment administration of any fees, costs or trade execution expenses from the FCM, ECM and Broker/Dealer Accounts;

(d) Providing the Client, upon its request, with any information, documentation or other materials, relevant to the services provided by Advisor to Client, which Client may reasonably request in order to enable the Client to assure that the Advisor is managing the Assets in a professional and reasonable manner;

(e) Providing the Client, upon reasonable notice and during normal business hours, with access to or copies of any of its books and records upon the Client's reasonable request, subject to Advisor's need to protect any confidential information, in order to enable the Client to assure the Advisor's compliance with the terms of this Agreement, including, but not limited to, its compliance with the Trading Program;

(f) Notifying the Client immediately about any known matter or thing, whether threatened or pending, and whether potential or actual, which has resulted or which would or could result in any investigation, disciplinary proceeding, indictment, or prosecution of, relating to, or concerning the Advisor or any of its officers, partners, employees or affiliates. Without limiting the generality of the foregoing, the Advisor shall immediately notify the Client if the Advisor, or any of its officers, partners,



employees or affiliates, is subpoenaed (for documents or oral testimony) in connection with any proceeding; and

(g) Advisor shall adhere to such leverage and risk parameters as established in the Trading Program. The Advisor shall cooperate with the Client in developing suitable risk management routines and procedures, including the setting of trading limits by the Client with the FCM, ECM and Broker/Dealers.

4. <u>Other Advisors and/or Other Funds</u>. The Client may allocate Assets to other advisors and/or other funds (the "Other Advisors and/or Other Funds"). Such Other Advisors and/or Other Funds shall enter into a separate trading advisory agreement or subscription agreement with the Client. Advisor and/or its traders shall be permitted to invest up to 20% of the Assets managed by Advisor during the first year of operations and up to 33% in subsequent years. Advisors' capital accounts will reflect only the profits/losses of Advisor's discrete trading performance, as well as deduction(s) for the Client's management fee and incentive allocation where applicable. Notwithstanding the preceding, the Advisor's and its traders' capital accounts shall be exposed to a default by the Fund.

5. <u>Obligations of the Client</u>.

(a) The Client shall be responsible for assuring the payment of all margins, premiums, commissions and other amounts due to the FCMs, the Dealers, the ECMs and Broker/Dealers in connection with transactions effected by the Advisor hereunder. The Client shall also authorize and instruct the FCMs, the Dealers the ECMs and Broker/Dealers to furnish the Advisor with copies of any and all statements, confirmations and other documents and materials provided to the Client with respect to trading conducted by the Advisor with such FCMs, Dealers, ECMs and Broker/Dealer hereunder. The Client shall provide accounting assistance to the Advisor; provided, however, that the Client shall not be liable to the Advisor or any of its affiliates for any losses sustained by the Advisor or any of its affiliates in connection with such accounting assistance. The Client hereby reserves the right to negotiate with the Advisor a reasonable monthly fee for its accounting assistance.

(b) The Client shall place under the management of the Advisor a minimum of $5 million in Assets and up to $10 million in Assets within three (3) months of the commencement of Advisor's trading the Assets, provided Advisor has operated within the Trading Program referenced in Sections 1(a) and 3(g).

6. <u>Compensation - Incentive Allocation</u>. As compensation for the services to be provided hereunder, the Client shall pay the Advisor an Incentive Allocation equal to 25% of the Fund's New Net Profits on all assets of the Fund under management by the Advisor (as such terms are defined in the Third Amended and Restated Limited Liability Company Operating Agreement of the Fund (the "<u>Operating Agreement</u>")). The Client shall pay Advisor an additional Bonus Allocation of 5% on all profits beyond a 20% net return to the Fund. The Incentive Allocations will be paid out on a quarterly basis with payment made no more than thirty (30) days after the end of each calendar quarter. If the aggregate Incentive Allocations paid to the Advisor during the first three quarters of a



calendar year exceed the actual Incentive Allocations to which the Advisor is entitled at the year end based on the calendar year's performance of the Fund, the Advisor shall promptly repay such excess to the Fund (not to exceed one-half of the Incentive Allocations already received by the Advisor during the calendar year). Notwithstanding any other provision of this Agreement, the Advisor hereby agrees that it shall reimburse the Client for all of the costs and expenses, including reasonable attorneys' fees and court costs, incurred by the Client in connection with any action brought to enforce the Advisor's obligation to repay any portion of the Incentive Allocation to the Fund.

7. **Capital Account.** In order to implement the provisions of Section 6, the Client shall establish a separate capital account on the Fund's books and records for the benefit of the Advisor. The capital account shall be calculated in accordance with the provisions of Section 6. The Advisor may make withdrawals from its capital account at any time upon reasonable notice to the Client. The Client shall have authority to deduct specifically agreed upon expenses from the Advisors capital account

8. **Representations and Warranties of the Advisor.** The Advisor hereby represents and warrants to the Client that:

(a) The Advisor is a limited liability corporation duly organized and validly existing in the State of Delaware and is qualified to do business and is in good standing in each other jurisdiction in which the nature or conduct of its business requires such qualification and in which the failure to so qualify would materially adversely affect its ability to conduct its business activities.

(b) The Advisor has full discretionary power and authority to perform its obligations under this Agreement.

(c) This Agreement has been duly and validly authorized, executed and delivered on behalf of the Advisor and is a valid and binding agreement of the Advisor enforceable in accordance with its terms.

(d) There is not pending or, to the best of the Advisor's knowledge threatened, any action, suit or proceeding before or by any court or other governmental or self-regulatory authority to which the Advisor, or any of its officers, partners, employees or affiliates, is a party which might reasonably be expected to result in any material adverse change in the financial condition of the Advisor or the Advisor's ability or qualification to trade for the Client.

(e) The Advisor is and will remain in compliance, in every material respect, with any and all applicable laws and regulations, including applicable provisions of the Commodity Exchange Act, regulations of the CFTC promulgated there under and the rules of any self-regulatory organization with jurisdiction over the Advisor.

(f) The Advisor has no arrangements or relationships, nor will the Advisor establish or maintain any such arrangements or relationships, with any FCM, Dealer ECM or Broker/Dealer pursuant to which the Advisor or any of its affiliates is or



may become entitled to receive any portion of the commissions or fees paid to such entities by the Client.

(g) The Advisor will exercise good faith and due care and will under no circumstances deliberately use any procedures in discharging its obligations hereunder that it knows or has reason to believe is, in view of the constraints imposed on the Advisor by the Client, inferior to the procedures employed for any other account for which the Advisor discharges obligations (either alone or in conjunction with others) similar to those undertaken by the Advisor hereunder.

(h) The Advisor will promptly notify the Client of any material changes in any of the foregoing representations and warranties or of any material changes in the trading approaches or strategies to be utilized in connection with its management of the Assets.

(i) The Advisor, pursuant to Section 4(m)(1) of the Commodity Exchange Act and CFTC Regulations 4.14(a)(10) and 4.14(a)(10)(B)(1) promulgated there under, is not required to be registered under the Commodity Exchange Act because it advises 15 or fewer persons within a 12 month period and does not hold itself out generally to the public as a commodity trading advisor.

9. <u>Representations and Warranties of the Client</u>. The Client hereby represents and warrants to the Advisor that:

(a) The Client is a limited liability company duly organized and validly existing in the State of Illinois and is qualified to do business and is in good standing in each other jurisdiction in which the nature or conduct of its business requires such qualification and in which the failure to so qualify would materially adversely affect its ability to conduct its business activities.

(b) The Client has full discretionary power and authority to perform its obligations under this Agreement.

(c) This Agreement has been duly and validly authorized, executed and delivered on behalf of the Client and is a valid and binding agreement of the Client enforceable in accordance with its terms.

(d) There is not pending or, to the best of the Client's knowledge threatened, any action, suit or proceeding before or by any court or other governmental or self-regulatory authority to which the Client is a party which might reasonably be expected to result in any material adverse change in the financial condition or regulatory qualifications of the Client.

(e) The Client understands and acknowledges that (i) trading Investment Products is speculative and involves a high degree of risk, including the risk of loss in excess of the amount initially invested, and that the trading strategies utilized by the Advisor will be speculative, (ii) there can be no assurance that profits will be realized, or losses avoided or limited, as a result of the trading activities conducted by the



Advisor hereunder, and (iii) no "safe" trading system has ever been devised and that the Advisor cannot guarantee profits or freedom from losses in connection with the trading of Commodities.

(f) The Client will not engage in actions that are disloyal, dishonest or insubordinate, or which constitute negligence, fraud or unprofessional conduct, or actions which adversely affect the business or reputation of the Advisor.

(g) The Client will promptly notify the Advisor of any material changes in any of the foregoing representations and warranties.

10. <u>Liability of the Advisor</u>. All transactions in Investment Products entered into hereunder shall be for the account and risk of the Client. The Advisor, including its employees and principals, shall not be liable to the Client for any losses sustained in connection with such transactions including the liquidation of Fund assets pursuant to Section 12(e), or for any errors, acts or omissions committed by the FCMs, the Dealers, the ECMs, the Broker/Dealers or other third parties, unless caused by the gross negligence or willful misconduct of the Advisor, its officers, partners, employees, affiliates or agents.

11. <u>Indemnification</u>.

(a) The Advisor will indemnify the Client, as well as its members, managers, employees, shareholders, officers, affiliates and agents, and each person, if any, who, directly or indirectly, controls, is controlled by, or under common control with the Client, and hold such persons harmless from and against (x) any and all claims, demands, proceedings, suits and actions against such persons and (y) any and all losses, liabilities, damages, expenses and costs (including, but not limited to, reasonable attorneys' fees and costs of investigation or preparation of defense) suffered by any such person, which, in the case of (x) or (y) above, result from or relate to (i) any material breach by the Advisor of its duties or obligations under this Agreement, (ii) any material inaccuracy or misrepresentation in, or breach of, any of the warranties, representations, covenants or agreements made by the Advisor herein, or (iii) any act or omission of the Advisor or its agents constituting gross negligence or willful misconduct.

(b) The Client will indemnify the Advisor, as well as its employees, agents, successors and administrators, and each person, if any, who, directly or indirectly, controls, is controlled by, or under common control with the Advisor, and hold such persons harmless from and against (x) any and all claims, demands, proceedings, suits and actions against such persons and (y) any and all losses, liabilities, damages, expenses and costs (including, but not limited to, reasonable attorneys' fees and costs of investigation or preparation of defense) suffered by any such person, which, in the case of (x) or (y) above, result from or relate to the services which Advisor shall perform under this Agreement with the exception of any matter caused by the gross negligence or willful misconduct of the Advisor.

(c) Promptly upon receipt of written notice of any claim or demand, or the commencement of any suit, action or proceeding in respect of which indemnity may



be sought under this Section 12, the party seeking indemnification (the "Indemnitee") shall promptly inform the party from which indemnification is sought (the "Indemnitor") in writing thereof. Except to the extent that the Indemnitor is not prejudiced thereby, the failure to so inform the Indemnitor shall relieve such Indemnitor from any liability which it may have to such Indemnitee in connection therewith. The Indemnitor will be entitled to participate in that suit, action or proceeding and shall, at the request of the Indemnitee, assume at its own expense the defense thereof with the assistance of counsel reasonably satisfactory to the Indemnitee. In any such action or proceeding, the Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the Indemnitee's own expense unless (i) otherwise agreed by the Indemnitor and Indemnitee or (ii) the named parties to any such suit, action or proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee, and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Indemnitee will cooperate with the Indemnitor in connection with any such action or proceeding and shall make personnel, books and records relevant to the claim available to the Indemnitor, and grant such representatives and counsel of the Indemnitor as such Indemnitor may reasonably consider desirable in connection with the defense of any such claim.

(d)   An Indemnitor shall not be liable under this Section 12 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder.

12.   <u>Term and Termination</u>.

(a)   <u>Initial and Renewal Terms</u>. This Agreement shall commence on the date hereof and shall continue for an initial period of three (3) years, subject to earlier termination as herein provided. This Agreement shall automatically renew for successive one (1) year periods after the initial term unless either party gives at least forty-five (45) days' prior written notice to the other party of its intention to terminate this Agreement at the end of the then current term. Termination of this Agreement shall discharge only those obligations that have not accrued as of the effective date of termination. Any right or duty of the Client or Advisor based on either the performance or breach of this Agreement prior to the effective date of termination shall survive the termination of this Agreement. The provisions of this Section 12 and Section 13 shall survive any termination of this Agreement.

(b)   <u>Termination</u>. The Client may terminate this Agreement at any time (i) upon five (5) days' prior written notice for any reason or no reason at all, and (ii) immediately for Cause (as hereinafter defined). This Agreement may only be terminated by the Advisor upon the occurrence of a material breach by the Client of any of its obligations, representations or warranties hereunder.

(c)   <u>Definition of Cause</u>. For purposes of this Agreement, any of the following acts or omissions shall give rise to a termination for "Cause" and shall subject the Advisor to the liquidated damages clause set forth in Section 12(d) below:



   (i) The Advisor's intentional misconduct, gross negligence or intentional breach of this Agreement or failure to use its best efforts to maximize trading results;

   (ii) The Advisor's engaging in actions that are disloyal, dishonest or insubordinate, or which constitute gross negligence, fraud or unprofessional conduct, or actions which adversely affect the business or reputation of the Client, or if the Advisor assumes risk greater than those parameters expressly provided by the Client in the Trading Program, all in the Client's sole discretion;

   (iii) The Advisor's failure to maintain any applicable registration requirements of any regulatory body that may have jurisdiction with respect to the Advisor's trading activities; or

   (iv) The Advisor's breach of any material provision Section 8 of this Agreement.

  (d) <u>Liquidated Damages</u>. The Advisor acknowledges that in the event of the Advisor's termination for Cause pursuant to Section 12(b), the Client will suffer substantial damages which may be difficult to determine. Accordingly, the Advisor agrees that in the event this Agreement is terminated by the Client for Cause, the Advisor shall promptly pay to the Client as liquidated damages, and not as a penalty, an amount equal to the Advisor's allocable share of the Fund's New Net Profits for the highest one (1) quarter out of the last three (3) consecutive quarters immediately preceding the date of such termination. The aforesaid liquidated damages shall be in addition to any other amounts for which the Advisor may be liable to the Client hereunder and any other rights or remedies available to the Client at law or in equity.

  (e) <u>Liquidation of Fund Assets</u>. Upon termination of this Agreement, Advisor, Bill Jamison, Stephen Harper and Jeffrey Ong (collectively "Principals"), jointly and severally, hereby unconditionally agree to assist the Client in taking such action with the Fund's funds and trading positions as the Client shall instruct. Without limiting the scope of the Advisor's and Principals' obligation in the preceding sentence to assist the Client after termination of this Agreement, each and all of them, if so requested by the Client, shall assist the Client in the orderly liquidation of any trading positions, transitioning or transferring open positions to a new trading advisor and otherwise using its best efforts to cooperate with the Client post-termination.

  (f) <u>Non-Solicitation of Employees</u>. Upon termination of this Agreement and for a period of two years thereafter, the Advisor agrees that it shall not, directly or indirectly, solicit or induce any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately prior to such solicitation or inducement) of any other Trading Advisor of the Fund to leave the employ of such Trading Advisor, or hire or attempt to hire any employee (including any former employee whose date of termination or resignation, as the case may be, occurred within a three (3) month period immediately



20. <u>Governing Law; Dispute Resolution</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Any dispute relating to or arising out of this Agreement shall be litigated exclusively in state or federal courts having their situs within the City of Chicago, Illinois.

21. <u>Amendments</u>. This Agreement may not be amended or modified except by written instrument duly executed by each of the parties hereto.

22. <u>Entire Agreement; Counterparts</u>. This Agreement sets forth the entire agreement of the parties relating to the subject matter hereof except as otherwise set forth herein. This Agreement may be executed in one or more counterparts each of which shall, however, together constitute one and the some document. This Agreement may be executed by facsimile transmission.

23. <u>Severability; Waiver</u>. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver granted hereunder must be in writing and shall be valid only in the specific instance in which given.

*[The remainder of this page has been intentionally left blank.]*



IN WITNESS WHEREOF, this Agreement has been executed for and on behalf of the undersigned as of the day and year first above written.

**CLIENT:**

THREE ZERO THREE CAPITAL PARTNERS, LLC ON BEHALF OF ITSELF AND THREE ZERO THREE ENERGY TRADING ALLIANCE, LLC

By: *[signature]*

Name: Edward Donnellan
Title: Principal

**ADVISOR:**

EVERGREEN ENERGY CAPITAL, LLC

By: *[signature]*

Name: Stephen Harper
Title: Principle

Accepted and agreed as to the provisions set forth in Section 12 (e)

*[signature]*
~~Bill Jamison, individually~~
William H Jamison, Jr.

*[signature]*
Stephen Harper, individually

*[signature]*
Jeffrey Ong, individually

# EVERGREEN ENERGY CAPITAL, LLC

## RISK MANAGEMENT PARAMETERS, LOSS TRIGGERS AND ACTIONS/PROCEDURES

The purpose of the risk parameters and loss triggers set forth below are to monitor trading risks and contain losses to pre-specified tolerances. These parameters and triggers are supplemented with continuous risk analyses and daily dialogue with the Trading Advisor on market and portfolio conditions. Should 303 Capital Partners, LLC determine losses and/or position size to be unacceptable, it would direct reduction and/or elimination through discussion with the Trading Advisor, as would action in extraordinary market conditions.

### TRADING STRATEGIES
TRADING ADVISOR: Evergreen Energy Capital, LP
Intercontinental Exchange and New York Mercantile Exchange ("NYMEX") listed and OTC natural gas, power and crude futures, futures options and forwards are traded applying various relative value strategies: basis spreads, directional basis and basis arbitrage, as well as limited short term outright positions in NYMEX natural gas, power and crude futures and options.

### APPROVED EXCHANGES
TRADING ADVISOR: Evergreen Energy Capital, LP
The NYMEX, Inter Continental, and NGX are the three approved power, crude and gas exchanges.

| RISK PARAMETERS | Immediate Action for Violation |
|---|---|
| Margin-to-Equity Limit<br>100% of allocated assets | - Notify M. Rane and two other 303 Principals<br>- Discuss cause and record resolution in Evergreen Energy Risk Log |
| VAR Limits<br>One standard deviation move<br>≤ 4% of AUM | - Same as above |
| Two standard deviation move<br>≤ 12.5% of AUM | - Same as above |

| LOSS TRIGGERS | Immediate Action |
|---|---|
| ≥ 2.5% of AUM | - Notify M. Rane and two other 303 Principals<br>- Discuss cause and record resolution in Evergreen Energy Risk Log |
| ≥ 5% of AUM | Same as above |

| | |
|---|---|
| ≥ 7.5% of AUM | - Notify M. Rane and two other 303<br>- Commence 25-50% position reduction, or exceptional alternative; record resolution in Evergreen Energy Risk Log. |
| ≥ 10% of AUM | - Notify M. Rane and two other 303 Principals<br>- Commence reduction of open positions by 50%, or exceptional alternative; and record resolution in Evergreen Energy Risk Log. |
| Net Asset Value ≤ 75% of AUM | - Notify M. Rane and two other 303 Principals<br>- Commence Liquidation<br>- Record activity in Evergreen Energy Risk |

**ALLOCATIONS AND BENCHMARKS**

- 303 will allocate up to $10,000,000 USD over the first three months of trading. 303 will continue to review Advisor's performance and add capital as needed provided Advisor operates within the Trading Program.

**Approved and Accepted by:**

*[signature]*
Michael Rane
303 Capital Partners, LLC

*[signature]* William H Jamison, Jr
Bill Jamison
EVERGREEN ENERGY CAPITAL